1  Anthony Martino
   P.O Box 5558
2  Buffalo Grove, IL 60089
3  224-900-7695
   tonymartinomusic@gmail.com
4  Plaintiff

FILED

DEC 09 2025

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

5

6

7

8          **UNITED STATES DISTRICT COURT**

9          **NORTHERN DISTRICT OF CALIFORNIA**

10          **SAN FRANCISCO DIVISON**

11

12  ANTHONY MARTINO                    )   Case No.:

13                  Plaintiff,         )   **PLAINTIFF'S COMPLAINT**
                                       )
14      vs.                            )   Jury Trial Demanded
                                       )
15  INTERNET ARCHIVE                   )
                                       )
16                  Defendant.         )
                                       )
17                                     )
                                       )
18                                     )
                                       )
19                                     )
                                       )
20  _____

21          Plaintiff, Anthony Martino, *pro se*, for his Complaint against Defendant Internet Archive,

22  alleges, on personal knowledge as to matters relating to himself and on information and belief as to

23  all other matters, as set forth below:

24          **NATURE OF THE ACTION**

25          1. Plaintiff brings this civil action for damages under the Copyright Act, 17 U.S.C. § 101 *et*

26

27  *seq*., arising from IA's direct copyright infringement of 35 copyrighted works, consisting of: (a) five

28  copyrighted sound recordings and their five respectively embodied musical compositions; (b) one

Complaint

additional musical composition; and (c) twenty-four separate lyrical compositions. Plaintiff also asserts claims for IA's contributory infringement of the same aforementioned five sound recordings and five embodied musical compositions, and the same additional musical composition, all of which have been infringed by other third parties as materially facilitated and enabled by IA.

2. A list of Plaintiff's separately infringed works as referenced in paragraph 1 herein is attached hereto as **EXHIBIT 1**, and all of the works listed thereon were also formally registered with the U.S. Copyright Office prior to all of IA's infringing acts set forth herein and as evidenced by the following list of Certificates of Registration issued to Plaintiff by the U.S Copyright Office: SRu507-366 (effective date of registration, 3/7/2003); SRu539-107 (effective date of registration, 8/27/2003); SRu982-184 (effective date of registration, 6/10/2009); Pau3-406-761 (effective date of registration, 1/14/2008); and SRu-628-333 (effective date of registration, 7/31/2006).

## PARTIES

3. Plaintiff, Anthony Martino, is an individual and resident of the state of Illinois.

3(b). Plaintiff is, amongst other things, a singer/songwriter and independent recording artist of whom between 2004 and 2010 had licensed several of his original songs/sound recordings into shows on various television networks and for other commercial or media uses (including some of the works at issue in this suit), and had also released a limited amount of his music to the general public for commercial purposes under various stage names or pseudonyms ("Tony Martino", "The Martino Conspiracy", and "The Rarest Kind"). Plaintiff involuntarily postponed his music career indefinitely in or about mid-2011 due to medical reasons, and until recently, had only sporadically resumed on a very limited public basis.

4. Defendant, Internet Archive (hereafter "IA"), is a not-for-profit corporation organized under the laws of California with its headquarters at 300 Funston Avenue, San Francisco, CA 94118.

Complaint

4(b).    IA operates its primary website, archive.org, a massive digital library offering free access to digitized media such as websites, software, sound recordings, and print materials. Its Wayback Machine allows users to access archived versions of websites, containing hundreds of billions of web captures.  Per its website, its mission is to "provide Universal Access to All Knowledge."

## JURISDICTION AND VENUE

5.    This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1338(a) because it involves claims of copyright infringement. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law, namely the Copyright Act, 17 U.S.C. § 501 *et seq.*

6.    Jurisdiction is also proper in this Court pursuant to 28 U.S.C. §1332(a), because the Plaintiff and IA are citizens of different states and the amount in controversy exceeds $75,000.

7.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1400(a) because a substantial part of the events giving rise to the claims occurred in this District, IA resides in this District for venue purposes, and IA is subject to personal jurisdiction in this District.

8.    Plaintiff has standing to bring this action pursuant to 17 U.S.C. § 501(b).

9.    The copyright in all musical compositions, lyrical compositions, and sound recordings that are at issue in this matter were registered in the United States Copyright Office prior to the filing of this matter, thereby satisfying the registration requirement of 17 U.S.C. § 411(a).

10.    All of Plaintiff's copyrights were registered prior to IA's acts of infringement, entitling Plaintiff to seek statutory damages for each work infringed pursuant to 17 U.S.C. § 504 and to seek an award of attorney's fees pursuant to 17 U.S.C. § 505.

Complaint

# FACTUAL BACKGROUND

11.  Upon public information and belief, between 2003 and 2010 www.myspace.com (hereafter "MySpace") was one of the largest social networking websites (if not the largest) in the world with over 100 million users.

12.  Upon personal knowledge and upon public information and belief, between 2003 and 2010 MySpace allowed for musicians, recording artists, and other users to create an Artist/Musician business profile page on its site for the purpose of then voluntarily uploading digital copies of their sound recordings embodying musical/lyrical compositions ("songs"). Third-party users of the general public could then stream any such uploaded recordings on-demand directly from the respective musician's/artist's/user's profile page on the site.

13.  Upon personal knowledge and upon public information and belief, between 2003 and 2010, MySpace also allowed artists and musicians the option of voluntarily offering their sound recordings/songs as permanent mp3 downloads to the general public directly from their respective profile page on the site (whether for free or for a monetary fee determined by the respective artist/musician or their record label).

14.  Upon personal knowledge and upon public information and belief, between 2003 and 2010, MySpace's then-applicable written terms and conditions permitted all artists/musicians and/or copyright owners that had uploaded sound recordings/songs to its site as set forth in paragraphs 12 & 13 herein, the right to instantaneously remove said sound recordings/songs from their respective profile pages on the site at any given time without notice so that they were no longer publicly accessible thereon to third-parties.  Any limited license granted to MySpace arising out of an copyright owner allowing for digital audio streaming of their uploaded recordings on its site was fully and immediately revocable upon the removal of such uploaded recordings by the copyright owner from their respective profile page, and did not allow for MySpace to distribute the uploaded recordings to third-parties outside of MySpace's immediate online platform.

- 4 -

Complaint

15.    Upon public information and belief, between 2003 and 2015, MySpace had hosted (on its servers) approximately 50 million songs/sound recordings as uploaded by over 14 million different musicians/recording artists and other users of its website.

15(b).    Plaintiff had voluntarily deleted/removed *any and all* of his recordings from his MySpace artist profile page by approximately the end of 2011 so that none were accessible to the general public, and had entirely ceased using the site in any meaningful capacity whatsoever shortly thereafter.

15(c).    Some of the recordings/musical compositions at issue in this suit as referenced in paragraphs 1-2 herein were never made publicly available by Plaintiff on MySpace at any point in time whatsoever, nor did Plaintiff ever provide a license or other permission to any agent or other third-party to make any of his recordings available in any capacity on MySpace.

16.    Upon public information and belief, in or about March of 2019, MySpace's corporate office publicly announced both on its website and to other worldwide media outlets that due to a botched "server migration" error of which had occurred sometime in 2018, MySpace had allegedly lost all of the sound recordings that had been uploaded to its website by musicians, artists and other users of its site between 2003 and 2015—a total loss of the approximate 50 million songs/recordings as referenced in paragraph 15 herein. *See, e.g., MySpace admits losing 12 years' worth of music uploads,* Published by CNN on March 18th, 2019 attached hereto as **EXHIBIT 2.**

17.    Upon public information and belief, on or about April 3rd of 2019, an employee of IA, Jason Scott, of whom held/holds the position of Archivist and Software Curator, publicly announced in a series of posts made on his personal X profile page (formerly known as Twitter):

- "ANNOUNCING THE MYSPACE MUSIC DRAGON HOARD, a 450,000 song collection of mp3s from 2008-2010 on MySpace, gathered before they were all "deleted" by mistake. https://archive.org/details/myspace_dragon_hoard_2010

Complaint

includes a link to a special custom search and play mechanism that lets you search and play songs."

- "This set of 450,000 songs was done by an anonymous academic group who were studying music networks and grabbed 1.3 terabytes of mp3s to study from MySpace in roughly 2008-2010 to do so. And someone asked me "hey, do you want these, since they were lost?"" Yes, yes I did.""

- If you have any lying around, hit me up. Also, please understand the Hobbit, the searcher that goes through the Dragon Hoard, can take a bit of time to spin up the considerable search index. We're optimizing and fixing that search up, and it will all be open-sourced. NOW DANCE."

These quotes are verified in the screenshots directly below:



Complaint

1

2

3

4

5

6

7

8

9

10

11



12    18.   Upon public information and belief, on or about August 11th of 2023, IA employee

13  Jason Scott received a public inquiry on his personal X profile page (formerly known as Twitter)

14  from an individual with the user name "Riza" regarding the content of the IA's MySpace Dragon

15  Hoard content, stating "Unfortunately, I still haven't found the pieces I'm looking for. Do you have

16  a blog post where you explain how you recovered this technically?"  In direct response to "Riza's"

17  inquiry, Mr. Scott publicly responded on his X profile page to explain as follows: "Not directly. A

18  group of academics took a core sample of mp3s from Myspace, and years later, realized they still

19  had the drive of them, and mailed it to me anonymously."  These quotes are verified in the below

20  screenshot, herein:

21

22

23

24

25

26

27

28

Complaint



19.  In a separate public post made in the comment section of the MySpace Dragon Hoard section of IA's website on or about July 23rd, 2023, Mr. Scott further clarified his direct involvement in the uploading of the 500,000 sound recordings to the IA website while acting within the scope of his employment by IA, stating: "This is Jason Scott, the person who helped coordinate the Dragon Horde being uploaded, as well as the Hobbit finder by James Baicoianu. The songs in the Hoard are the songs we have. There are no more in the "back room". Regarding the reviews asking after or about other songs or artists you wish to find: feel free to leave them. They can be used by others who might have copies, or if more song hoards become available, checked against." These quotes are verified in the below screenshot, herein:

Complaint

20. Essentially, as part of what IA has titled the "The Myspace Dragon Hoard (2008-2010)" collection, IA itself—via the agency of its own employees acting within the scope of their employment and/or via its own contracted content-moderators acting with IA's explicit permission and authority —directed and uploaded/reproduced poor audio-quality (96 kbps, 22 kHz) MP3 copies of approximately 500,000 sound recordings originating from MySpace of which IA employee Jason Scott had purportedly obtained on a hard drive mailed to him from the allegedly "anonymous" party/parties as explicitly referenced in paragraphs 17-19 herein, onto a designated area of IA's own primary website at: https://archive.org/details/myspace_dragon_hoard_2010

20(b).    Upon information and belief, the allegedly "anonymous academic group" (or whomever the true party was/is that provided the hard drive to IA) used an automated computer process of some kind (e.g., web scraping, writing scripts for API downloading, etc.) in order to have amassed the approximate 500,000 song collection of downloaded sound recordings from MySpace's servers (where the recordings were originally hosted) of which comprises IA's Myspace Dragon Hoard collection.

21.    Of the approximate 500,000 sound recordings/songs that IA received from the "anonymous academic group" and subsequently uploaded/reproduced as MP3 copies to its website as explicitly referenced in paragraph 20 herein, the notoriety of the artists/musicians ranges the gamut from thousands of copyrighted songs by current and massively popular recording artists such as Taylor Swift, Beyonce, Lady Gaga, Adele, and John Mayer, to legacy artists such as The Beatles, The Beach Boys, Marvin Gaye, and Elvis Presley, to recordings by independent and/or otherwise lesser-known recording artists.  Moreover, taken as a whole collection, no reasonable actor in the digital music space, including IA, could believe such material was authorized for free distribution by and from any anonymous third-party that had allegedly mailed copies on a hard drive.

22. Through its primary website (as stated in paragraph 20 herein), IA made all of the approximate 500,000 sound recordings/songs comprising its MySpace Dragon Hoard Collection—

Complaint

including the 5 sound recordings/5 embodied musical compositions and 1 additional musical

composition of Plaintiff's as referenced in paragraphs 1 and 2 herein—available to the general

public for free and unlimited permanent download as a 1.1 terabyte digital MP3 collection of which

can/could be downloaded either in its entirety via a single click, or in smaller batches (thousands of

recordings) via 144 separately numbered zip (.zip) folders, as can be shown in the screenshot herein

this paragraph:



23. Furthermore, upon information and belief, every single one of the approximate 500,000

sound recordings/songs that were uploaded/reproduced by IA and comprise its "MySpace Dragon

Hoard collection" on its primary website were uploaded/reproduced without any copyright

management information ("CMI") whatsoever as the term is defined in 17 U.S. Code § 1202(c),

such as the name of the performing artist, song title, publisher, author/composer, album title, record

label, ISRC code ("International Standard Recording Code"), and/or copyright year—all items of

which would normally be embedded as metadata on authentic digital copies authorized by a

Complaint

copyright owner or artist's record label as standard practice in the recording industry for the purpose of tracking usages and collecting associated revenue therefrom.

24.    Instead, IA's uploaded/reproductions for each sound recording contained/contains nothing more than file names of which consist of 36 seemingly random or auto-generated characters (letters, numbers and/or symbols) followed by the extension ".mp3".  For example, the 5 respective sound recordings/5 embodied musical compositions and 1 additional musical composition of Plaintiff of which are the subject of this lawsuit as referenced in paragraphs 1 & 2 herein, were uploaded/reproduced by IA and made available to the general public as free and unlimited permanent mp3 downloads within four separately numbered zip folders (#76, #77, #84 & #86) on its public website as previously referenced in paragraphs 20 and 22 herein, with the below file names:

std_72ea6c8562d82c69c16d3095e5125fbc.mp3

std_3e4bbb5e4b18d9d53f51ef2f42abb670.mp3

std_6c84b7eb17956e0fa2d016ec7a39f1cc.mp3

std_0566f35bd764b127f4a8342c14546d8f.mp3

std_3101d4d0e70a991ec6b4531c4ae364f7.mp3

std_756409e9767e18ad7bfcc5eb4bb6a50c.mp3

24(b).    Furthermore, metadata inspection using ExifTool (version 13.41) confirms that IA's digital reproductions of all 5 sound recordings/5 embodied musical compositions of Plaintiff that are the subject of this suit as referenced in paragraphs 1 & 2 herein were completely stripped of every category of CMI explicitly referenced in paragraph 23 herein that would've been (and in fact are) embedded on authentic digital copies ever previously authorized for release by Plaintiff or uploaded (by Plaintiff) to MySpace, including the song titles, artist name, album title, copyright year, publisher name, performing rights organization, and ISRC codes as shown in the four

Complaint

1  screenshots herein directly below (all pertaining to one of the five relevant recordings at issue in

2  this suit):

3



- 12 -

std_72ea6c8562d82c69c16d3095e5125fbc

| Details | Artwork | Lyrics | Options | Sorting | File |
|---------|---------|--------|---------|---------|------|

kind **MPEG audio file**
duration **5:04**
size **3.7 MB**
bit rate **96 kbps**
sample rate **22.050 kHz**
channels **Joint Stereo**
volume **-5.6 dB**
id3 tag **None**
encoded with **Unknown**
format **MPEG-2, Layer 3**

24(c).    Contrary to IA's uploaded reproduction copies of Plaintiff's 5 sound recordings/5 embodied musical compositions, an authentic/authorized digital copy of Plaintiff's recording as corresponding to IA's file std_72ea6c8562d82c69c16d3095e5125fbc.mp3 as shown directly above in paragraph 24(b) herein, would have/should have instead contained the embedded CMI (song title, artist name, album title, copyright year, and ISRC code) as shown in the screenshots directly below:

Size: 10,509,837 bytes (10.1 MB on disk)
Where: Macintosh HD ▸ Users ▸ TONY ▸ Music ▸ iTunes ▸ iTunes
       Media ▸ Music ▸ Tony Martino ▸ Slightly Defined
Created: Tuesday, January 12, 2010 at 3:51 PM
Modified: Tuesday, January 12, 2010 at 3:51 PM

    Stationery pad

    Locked

More Info:

    Title: All We've Got Is Now
    Duration: 05:03
    Authors: Tony Martino
    Copyright: ℗ 2010 Tony Martino Music/ASCAP Copyright
Audio channels: Stereo
    Sample rate: 44.1 kHz
    Album: Slightly Defined
Musical genre: Pop
Year recorded: 2010

Complaint

25.    At some point in time after IA initially made its MySpace Dragon Hoard collection available to the general public as described in paragraph 22 herein, as a secondary means of distributing it, IA then launched a separate companion website (www.lostmyspace.com) entirely dedicated to the project of which features a music streaming player and allows visitors to this site to search for songs and artists, and then fully stream and/or permanently download (as individual mp3 files) any of the recordings in its collection on an unlimited basis, individually, and for free.

25(b).    Upon information and belief, the search, streaming, and mp3 download functionality of IA's separate site, www.lostmyspace.com (as explicitly referenced in paragraph 25 herein) was

Complaint

developed with the assistance of volunteers that were solicited for by IA employee Jason Scott,

including an individual named James Baicoianu, further evidencing that the MySpace Dragon

Hoard collection and its accessibility to the general public was directed by IA itself, not by any

random third-party user.

25(c).    In fact, a public posting made by this individual (Mr. Baicoianu) on Hacker News'

website (http://news.ycombinator.com/) on April 6, 2019 as shown in the below screenshot (with

blue arrow annotation) states: "Hi, author of the utility here. Yeah there wasn't a repo yet when we

went live, I whipped the whole thing up in a night when Jason put out a request for helpers.  I've

now published the code for this player to Github, it's available at https://github.com/jbaicoianu/ia-

myspace-music-search - pull requests welcome!  Still figuring out which license Arhive.org

[Internet Archive] wants (I'm just a volunteer).  I've also added a download link to the player so its

easier to get at the original mp3s now…".



26.    All 5 of Plaintiff's sound recordings/5 embodied musical compositions, as well as 1

additional musical composition, as referenced in paragraphs 1 & 2 herein were available on IA's

separate website (www.lostmyspace.com) as referenced in paragraph 25 herein, and were both fully

Complaint

1  streamable and downloadable for free as individual mp3 files on an unlimited basis, as shown in the

2  below screenshot:



11      27.    At no point in time whatsoever, did Plaintiff himself ever make any of the sound

12  recordings/embodied musical compositions as explicitly set forth within paragraphs 1 and 2 herein

13  available to the general public for free permanent download through his former artist profile page

14  on MySpace or anywhere else on MySpace, nor did he ever permit any other third-parties to do so.

15      28.    Some of Plaintiff's sound recordings/musical compositions as explicitly listed within

16  paragraph 2 herein were (and still are) unpublished and have yet to have *ever* been made publicly

18  available in any capacity *anywhere in the world* (including on MySpace), and as such, IA's

19  reproduction/distribution to the general public was the initial publication and it is currently

20  unknown to Plaintiff how any of his unpublished works could even have originated on any hard

21  drive that IA or its employees allegedly would have obtained for the purpose of sourcing the content

22  for its MySpace Dragon Hoard project.

24      29.    Plaintiff first learned of IA's infringement of his 5 sound recordings/5 embodied

25  musical compositions and 1 additional musical composition as explicitly set forth within paragraph

26  2 herein in March of 2024, when an Illinois resident personally advised Plaintiff that during that

27  same month, he'd come across Plaintiff's works on IA's website www.lostmyspace.com as

Complaint

1  referenced in paragraph 26 herein, and that he was able to both fully stream and/or permanently

2  download each of the works therefrom and as generated directly from IA's servers.

3          30.     Thereafter, Plaintiff mailed (via USPS) three separate takedown notices to IA at the

4  copyright agent address explicitly listed on IA's own website as shown in the screenshot (with blue

5  arrow annotation) herein this paragraph below:

6



17         31.     Plaintiff mailed the first takedown notice in or about March of 2024 via standard U.S.

18  Mail; the second via USPS certified mail (tracking # 9514806601264323015390) on November

19  18th, 2024; and the third via USPS certified mail (tracking # 9514806601365006377887) on January

20  6th, 2025.

21         32.     IA received Plaintiff's two separate certified mailings as set forth in paragraph 31

22  herein on November 27th, 2024 and January 13, 2025 respectively, as both mailings were signed for

23  by an individual at IA's listed copyright agent address as set forth in paragraph 30 herein, and as

24  confirmed in the screenshots herein this paragraph below:

25

26

27

28

Complaint



33.     Having not received any response whatsoever from IA, on January 18th, 2025

Plaintiff sent a follow up email to IA through its support desk email address (info@archive.org) as

listed on its primary website. In the email, Plaintiff attached a copy of his most recent (January 6th,

2025) certified letter w/exhibits that IA previously received at its Copyright Agent address on

January 13th, 2025.

34.     Despite Plaintiff's written/mailed letter attempts since March of 2024 to prompt IA

to remove his sound recordings from its two websites as referenced in paragraphs 30-33 herein, IA

did not remove the works until at least January 28th, 2025, when an individual named Chris Butler

(with the stated title of Office Manager) emailed Plaintiff and advised that the content had finally

been publicly disabled from its two websites.

Complaint

35.   In or about mid-March of 2025, Plaintiff first learned that IA had infringed 24 additional copyrighted works (24 separate song lyrics as referenced in paragraph 2 herein) when an Illinois resident personally advised Plaintiff that during that same month, he'd discovered that IA had scanned physical copies of said printed works and uploaded them into existing digital collections of IA's, made re-coded copies of same available for download as PDF files (using LuraDocument PDF Compressor v2.68), and then publicly displayed them in full on its website.

36.   The 24 lyrical compositions as referenced in paragraph 35 herein were scanned, copied and uploaded by IA itself via the agency of at least three of its own employees, partners, interns, volunteers, content moderators and/or other authorized contributors acting within the direct scope of IA's digitization and collection work and with IA's direct oversight and direction, as opposed to having been done at the sole volition of random third-party users of IA's website from the general public.  These individuals are identified as associate-kithan-ma@archive.org, associate-mariorenier-teano@archive.org, and associate-yuenyee-ming@archive.org, as shown in the screenshots herein this paragraph below:



Complaint

37.     In fact, the three individuals referenced in paragraph 36 herein of whom scanned and uploaded the 24 lyrical works of Plaintiff's onto IA's website did so not from general public user-registration accounts of IA's website, but rather, using accounts identified as IA's "associate accounts", which upon information and belief, are internally provisioned accounts approved by IA and tied to official digitization or cataloging work of IA itself and of which IA has the ability to control, particularly as it concerns the curation of content for its public website.

38.     Specifically, upon information and belief, IA creates its "associate accounts" solely for its own employees/interns, content-moderators/curators, staff members, and project collaborators, or it grants access to these accounts only to its verified partners (such as other libraries, archives, or media preservation groups), as users of these associate accounts are able to upload content directly into curated collections of IA's on its website, and of which normal registered users of IA's website from the general public cannot access or modify.

Complaint

39.    At all relevant times, IA had either actual knowledge, or at least reasonable grounds to know that some portion of the approximate 500,000 sound recordings that it had allegedly received in the mail on a hard drive from an allegedly "anonymous academic group," and of which it had then ingested from said hard drive and re-distributed as comprising its MySpace Dragon Hoard project as referenced in paragraphs 20-22 herein, were legally protected by copyright law. However, IA performed no investigation of any kind into the copyright status of any of the recordings, including Plaintiff's, before uploading the content to its website and making the entire collection of recordings available to the general public for free permanent download and on-demand streaming.

40.    At all relevant times, IA knew full well that its business practice of uploading copyrighted sound recordings to its website and making them available to the general public for unlimited streaming and permanent downloading without any license or authorization as it did with the near 500,000 recordings it uploaded in connection with its MySpace Dragon Hoard project was potentially infringing. In fact, in 2020, IA's founder and director, Brewster Kahle, acknowledged that building an audio library "is doable. Except that it's a very heavily litigated area," and that "[e]xactly how to do the distribution on the commercial materials, we haven't quite figured out." Long Now Foundation, Universal Access to All Knowledge, YOUTUBE, https://www.youtube.com/watch?v=RV_ALIJGU_c (May 25, 2020) (Brewster Kahle speaking & 27:30).

41.    Furthermore, IA was actually notified that its various business activities concerning its offering of free sound recordings to the general public for unlimited free downloading and streaming was potentially infringing. On June 10, 2020—just over a year after IA had launched its MySpace Dragon Hoard project—Senator Thom Tillis, then-Chair of the Senate Subcommittee on Intellectual Property, wrote a letter to Mr. Kahle and Internet Archive that Internet Archive's "ma[king] recordings available for free through unlimited streaming and download . . . raise

- 21 -

Complaint

numerous potential issues of copyright infringement." Letter from Sen. Thom Tillis to Brewster

Kahle (Jun. 10, 2020) 2. Senator Tillis added that "I am concerned that the Internet Archive thinks

that it—not Congress—gets to determine the scope of copyright law. . . . Internet Archive seems to

be daring copyright owners to sue to enforce their rights, or else effectively forfeit them—

something many copyright owners, particularly individuals and smaller enterprises, cannot afford to

do." Id. Tillis Letter to Internet Archive attached hereto as **EXHIBIT 3.**

42.    At all relevant times, IA had actual knowledge, or at least reasonable grounds to

know, that Plaintiff's works as referenced in paragraphs 1 & 2 herein, were legally protected by

copyright law, and would have required appropriate licenses to make copies, to distribute, and to

publicly display or perform via digital audio transmission.

42(b).    IA also had actual knowledge, or at least red flag knowledge, that any allegedly

"anonymous academic group" (or whomever the true third-party may be) that was offering to send

it (via a mailed hard drive) nearly 500,000 allegedly "lost" mp3 files as originating from the servers

of MySpace, should have been able to produce (to IA) valid licensing agreements or other legal

authorization so as to justify why IA could legally ingest, copy, distribute and publicly perform via

digital audio transmission without violating copyright law.

43.    At all relevant times, IA had actual knowledge that the allegedly "anonymous

academic group" (or whomever the true third-party or parties may be) that allegedly mailed it a hard

drive of which contained Plaintiff's sound recordings/embodied musical compositions as referenced

in paragraphs 1-2 herein, had no license or other agreement from Plaintiff to provide copies of such

to IA.

44.    At all relevant times, IA knew that it had no license of any kind from Plaintiff as the

copyright owner or from any agent of Plaintiff's, nor from any other authorized body having the

legal authority to administer a license to IA on behalf of Plaintiff, to upload, copy, distribute, or

publicly display or perform via digital audio transmission any of Plaintiff's copyrighted works as

Complaint

1    referenced in paragraphs 1 & 2 herein, yet it willingly disregarded copyright law to do just that, as

2    well as willingly facilitated other third-party infringers to do the same.

3        45.    Moreover, IA generates millions of dollars in annual revenue, a significant portion of

4    which stems directly from soliciting the general public for monetary donations through its business

5    practice of offering free copyrighted content that it itself does not own or have any rights in, such as

6    sound recordings and books, as an enticement for such monetary donations, as well to entice

7    continued overall traffic to its webpages for other commercial purposes.

8

9        46.    In fact, IA's former Director of Finance, Jacques Cressaty, testified on 10/22/21 in the

10   copyright litigation matter of *Hachette Book Group, Inc. v. Internet Archive*, No. 20-cv-4160 (JGK),

11   664 F.Supp.3d 370 (S.D.N.Y. 2023), WL 2623787 (S.D.N.Y. 2023), "every single page of the

12   Archive is monetized."  (McN Decl. ¶61.)  (Jacques Cressaty Dep. Tr. 207:1-208:4) attached hereto

13   as **EXHIBIT 4.**

14

15       47.    Consistent with IA's business practice of monetization via the solicitation of

16   monetary donations in exchange for free digital content, IA's designated area on its public website

17   for its free MySpace Dragon Hoard Project content also often contained/contains banners at the

18   very top of the page of which explicitly sought/seeks monetary donations as shown in the

19   screenshots directly herein below:

20



Complaint





Complaint

48.    IA willfully ingested, copied, and distributed the approximate 500,000 sound recordings that comprise its MySpace Dragon project, including those of Plaintiff's as referenced in paragraphs 1 and 2 herein, in complete disregard of existing copyright law and the rights of the musicians and recording artists that comprise the content of the collection—a significant portion of which are either independent or lesser-known artists that may not have the means or ability to enforce copyrights—and for no other reason but to further bloat its massive database of free digital content offerings under the guise of legitimate library archiving activity.

49.    Upon information and belief, IA possesses the exclusive knowledge as to the exact number of total visitors to its primary website that downloaded its entire 1.1 terabyte MySpace Dragon Hoard collection (which included all of Plaintiff's recordings at issue), as well as the exact number of total visitors to its primary website (archive.org) that downloaded any of the four individually numbered zip folders that contained Plaintiff's recordings in part as set forth in paragraph 24 herein.  As of the filing date of Plaintiff's instant Complaint, the download area of the MySpace Dragon Hoard shows a total view count in excess of 200,000 as shown in the below screenshot:



Complaint

50.    Moreover, some of the users within the general public that downloaded the entire

MySpace Dragon Hoard collection, both nationally and internationally, have themselves engaged in

downstream infringement by having re-uploaded the entire collection onto their own servers, and

then making the collection available for free unlimited streaming and unlimited permanent

downloading through their own websites with enhanced speed and search capability.

51.    For example, one such user, of whom upon information and belief is based in

Switzerland, posted publicly on the social media platform Reddit sometime in or about 2019, of

having downloaded the *entire* MySpace Dragon Hoard collection from the Internet Archive,

creating a torrent from them, and then adding a search engine on top of it which allows for direct

downloading at https://cable.ayra.ch/myspace/ as shown in the two screenshots directly herein

below:



Complaint



52.    As shown in the screenshot directly below herein this paragraph, all 5 of Plaintiff's sound recordings/5 embodied musical compositions, and 1 additional musical composition, as explicitly set forth within paragraphs 1& 2 herein had been downloaded from IA's website by the user referenced in paragraph 51 herein as part of the MySpace Dragon Hoard collection, and then subsequently made available for streaming and download by the user on their own website:

53.    In a further example of downstream infringement, another user of the general public of whom upon information and belief is based in Minneapolis, Minnesota, also downloaded the *entire* 1.1 terabyte MySpace Dragon Hoard collection from IA's website, and then re-uploaded/reproduced the collection so as to be hosted onto his own website called MyDora (https://mydora.restorativland.org/), where the site features a continuous music streaming player of every single song in the library (filterable by genre) and allows for free and unlimited permanent downloading of any song individually as shown in the 3 screenshots directly below:

- 27 -

Complaint







Complaint

54.    All 5 of Plaintiff's recordings/5 embodied musical compositions, and 1 additional musical composition, as referenced in paragraphs 1 and 2 herein, were individually streamed and downloaded from the MyDora website as referenced in paragraph 53 herein by an Illinois resident in March of 2024 and March of 2025, and were fully streamable and downloadable through said website's music player.

55.    A metadata inspection using ExifTool (version 13.41) confirms that the copies of Plaintiff's recordings as downloaded from MyDora originated via the direct download by the owner of the MyDora website from IA's MySpace Dragon Hoard collection, as the files are identical between the two (including even the file names) as shown in the below comparison table:

| Field / Property | Apple iTunes (Official) | Internet Archive (Downloaded) | MyDora (Streamed) |
|---|---|---|---|
| File Name | 07 All We've Got Is Now.m4a | std_72ea6c8562d82c69c16d3095e5125fbc.mp3 | std_72ea6c8562d82c69c18d3095e5125fbc.mp3 |
| File Size | 11 MB | 3.6 MB | 3.6 MB |
| Bitrate | 281 kbps | 96 kbps | 96 kbps |
| Sample Rate | 44100 Hz | 22050 Hz | 22050 Hz |
| Duration | 0:05:04 | 0:05:04 | 0:05:04 |
| Artist | Tony Martino | N/A | N/A |
| Album Artist | Tony Martino | N/A | N/A |
| Copyright / CMI | © 2010 Tony Martino Music / ASCAP | False | False |
| ISRC | DittoMusic:isrc:USNFKD900007 | N/A | N/A |
| Original Media Flag | N/A | False | False |
| Where From Metadata | N/A | http://lostmyspace.com/ https://ia800900.us.archive.org/view_archive.php?archive=/3/items/myspace_dragon_hoard_2010/86.zip&file=09A2Fstd_72ea6c8562d82c69c16d3095e5125fbc.mp3 | about:client https://mydora.restorativland.org/songs/88/std_72ea6c8562d82c69c16d3095e5125fbc.mp3 |

56.    Furthermore, as the comparison table in paragraph 55 herein shows, unlike the copies of Plaintiff's sound recording (std_72ea6c8562d82c69c16d3095e5125fbc.mp3) that were uploaded/distributed by/from IA and also by/from the owner of the MyDora website of which contain no CMI whatsoever, an authentic digital copy of the same recording (available at one time through Apple iTunes) contains numerous categories of sound recording-related and musical-composition related CMI embedded in its metadata, including the Song Title, Artist Name, Album

Complaint

Title, copyright year, publishing company name, distributor, ISRC code, and performing rights

organization (ASCAP).

57.    Likewise, compared to the reproduction copies of Plaintiff's recordings that were

uploaded/distributed by/from IA and also by/from the owner of the MyDora website, all of which

contain no CMI whatsoever, authentic/authorized digital copies of the other 4 sound recordings and

1 additional musical composition of Plaintiff as referenced in paragraphs 1 and 2 herein, also differ

in the same exact way as the sound recording referenced in paragraph 56.

58.    Upon information and belief, all of the approximate 500,000 sound recordings that IA

copied/uploaded and distributed as comprising its MySpace Dragon Hoard collection—not just

those of Plaintiff's—contain no CMI whatsoever.

59.    At the immediate time that IA allegedly received the hard drive containing the

approximate 500,000 sound recordings from the "anonymous academic group" (or from whomever

the true party may be) and ingested said content into its own servers—and prior to its upload and re-

distribution of said content to the general public—it was fully aware that the all of the recordings

had been compressed to lower resolution audio quality and stripped of any/all originally-embedded

CMI.

60.    Upon information and belief, all of the approximate 500,000 sound recordings that

comprise IA's MySpace Dragon Hoard collection were compressed to lower resolution audio

quality and stripped of any originally-embedded CMI either by IA itself, the anonymous party that

produced the content to IA, or by MySpace itself at the immediate time that the recordings were

originally uploaded to MySpace.

61.    Nowhere on IA's primary website in the section that it explicitly designated for its

MySpace Dragon Hoard collection, nor anywhere on its secondary website for the project

(www.lostmyspace.com), did IA post any disclaimers, warnings, or notifications to users/visitors of

the sites that the sound recordings it was offering (including those of Plaintiff) for streaming and

- 30 -

Complaint

permanent download may be copyrighted, and as such, IA implicitly represented to its users within the general public that it had the legal right to offer the recordings in such a manner and that users had the legal right to stream and download them as offered.

62.    As a library that regularly handles and offers digital audio recordings to the general public, IA knew or had the constructive knowledge to know that intentionally distributing sound recordings that were missing all embedded CMI categories of any kind whatsoever, but especially embedded CMI such as copyright year/copyright marks, would almost certainly conceal infringement, as well as enable and facilitate downstream infringement by other third-parties who subsequently downloaded recordings from IA's MySpace Dragon Hoard collection.

63.    As a library that regularly handles and offers digital audio recordings to the general public, IA was fully aware of the relevance of ISRC codes as CMI to sound recordings, such as that ISRC codes distinguish one recording or version from another; that they are used by streaming services (e.g., Spotify, Apple, Tidal, etc.), collection societies (e.g., PPL, SoundExchange), broadcasters, and content sharing websites such as YouTube, for the purposes of identifying which recording was played, who owns it, and so as to route performer and master owner royalties correctly; and that they are used by copyright owners to track usages (downloads, streams, etc.) and to assert rights internationally.

64.    As a library that regularly handles and offers digital audio recordings to the general public, IA knew that by intentionally reproducing and distributing copies of sound recordings that were missing their ISRC codes, such as those that were missing from the copies it made and distributed of Plaintiff's recordings to other third-parties, that in the event of downstream infringement the absence of ISRC codes would make it extremely difficult (if not impossible) for copyright owners (including Plaintiff) to track third-party usages of those copies, discover infringement, as well as to obtain licensing revenue and/or royalties from any such usages, thereby causing loss of attribution and licensing control for the copyright owners (including Plaintiff).

- 31 -

Complaint

65.    As a library that regularly handles and offers digital audio recordings to the general public, IA knew that by intentionally reproducing and distributing copies of sound recordings that were missing all categories of CMI whatsoever, it would conceal infringement and create a difficult, if not impossible, task for copyright owners to discover infringement of same other than by happenstance, good fortune, reliance on third-party notification, or by other non-traditional means.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Infringing Reproduction against IA**

66.    Plaintiff repeats and realleges paragraphs 1-65 above as if fully set forth herein.

67.    As the sole copyright registrant, Plaintiff owns the exclusive rights in the 5 sound recordings/5 embodied musical compositions, 1 additional musical composition, and 24 separate lyrical compositions at issue, the list of which is explicitly set forth in paragraph 2 herein.

68.    By the acts set forth above, IA has infringed Plaintiff's exclusive rights in each of the protected sound recordings, musical compositions, and lyrical compositions explicitly set forth in paragraph 2 herein, by reproducing them in violation of 17 U.S.C. §§ 106(1).

69.    At no time did IA have any authorization, permission, license, or consent to reproduce or otherwise use the Plaintiff's copyrighted works of which are explicitly set forth in paragraph 2 herein.

70.    Each such infringement by IA constitutes a separate and distinct act of infringement.

71.    IA's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.

72.    As a direct and proximate result of the infringements by IA, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), including in an amount ranging from $30,000 to $150,000 per each protected sound recording, each protected musical composition, and each

Complaint

1    protected lyrical composition infringed, or in such other amount as may found to be proper under 17

2    U.S.C. § 504(c);

3        73.    Plaintiff is entitled to seek attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

4                            **SECOND CAUSE OF ACTION**

5    **Infringing Public Performance by Means of a Digital Audio Transmission against IA**

6        74.    Plaintiff repeats and realleges paragraphs 1-65 above as if fully set forth herein.

7

8        75.    As the sole copyright registrant, Plaintiff owns the exclusive rights in the 5 sound

9    recordings/5 embodied musical compositions, and 1 additional musical composition, the list of

10    which is explicitly set forth in paragraph 2 herein.

11        76.    By the acts set forth above, IA has infringed Plaintiff's exclusive rights in each of the

12    protected sound recordings and musical compositions that are explicitly set forth in paragraph 2

13    herein, by performing them publicly by means of a digital audio transmission without authorization

14    
15    in violation of 17 U.S.C. §§ 106(6).

16        77.    At no time did IA have any authorization, permission, license, or consent to perform

17    publicly by means of a digital transmission or otherwise use Plaintiff's copyrighted works of which

18    are explicitly set forth in paragraph 2 herein.

19        78.    Each such infringement by IA constitutes a separate and distinct act of infringement.

20        79.    IA's acts of infringement are willful, intentional, purposeful, and in disregard of and

21    
22    indifferent to the rights of Plaintiff.

23        80.    As a direct and proximate result of the infringements by IA, Plaintiff is entitled to

24    statutory damages pursuant to 17 U.S.C. § 504(c), including in an amount ranging from $30,000 to

25    $150,000 per each protected sound recording and each protected musical composition infringed, or

26    in such other amount as may found to be proper under 17 U.S.C. § 504(c);

27        81.    Plaintiff is entitled to seek attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

28

- 33 -

Complaint

### THIRD CAUSE OF ACTION
**Infringing Distribution against IA**

82.   Plaintiff repeats and realleges paragraphs 1-65 above as if fully set forth herein.

83.   As the sole copyright registrant, Plaintiff owns the exclusive rights in the 5 sound recordings/5 embodied musical compositions, 1 additional musical composition, and 24 separate lyrical compositions at issue, the list of which is explicitly set forth in paragraph 2 herein.

84.   By the acts set forth above, IA has infringed Plaintiff's exclusive rights in each of the protected sound recordings, musical compositions, and lyrical compositions that are explicitly set forth in paragraph 2 herein, by distributing copies of them publicly without authorization in violation of 17 U.S.C. §§ 106(3).

85.   At no time did IA have any authorization, permission, license, or consent to distribute or otherwise use Plaintiff's copyrighted works of which are explicitly set forth in paragraph 2 herein.

86.   Each such infringement by IA constitutes a separate and distinct act of infringement.

87.   IA's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.

88.   As a direct and proximate result of the infringements by IA, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), including in an amount ranging from $30,000 to $150,000 per each protected sound recording and each protected musical composition infringed, or in such other amount as may found to be proper under 17 U.S.C. § 504(c);

89.   Plaintiff is entitled to seek attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

### FOURTH CAUSE OF ACTION
**Infringing Public Display against IA**

90.   Plaintiff repeats and realleges paragraphs 1-65 above as if fully set forth herein.

91.   As the sole copyright registrant, Plaintiff owns the exclusive rights in 24 separate lyrical compositions at issue, the list of which is explicitly set forth in paragraph 2 herein.

- 34 -

92.     By the acts set forth above, IA has infringed Plaintiff's exclusive rights in each of the 24 lyrical compositions that are explicitly set forth in paragraph 2 herein, by publicly displaying its copies of said works without authorization in violation of 17 U.S.C. § 106(5).

93.     At no time did IA have any authorization, permission, license, or consent to publicly display or otherwise use Plaintiff's copyrighted works of which are explicitly set forth in paragraph 2 herein.

94.     Each such infringement by IA constitutes a separate and distinct act of infringement.

95.     IA's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.

96.     As a direct and proximate result of the infringements by IA, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), including in an amount ranging from $30,000 to $150,000 per each protected lyrical composition infringed, or in such other amount as may found to be proper under 17 U.S.C. § 504(c);

97.     Plaintiff is entitled to seek attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

### FIFTH CAUSE OF ACTION
**Infringing Derivative Work against IA**

98.     Plaintiff repeats and realleges paragraphs 1-65 above as if fully set forth herein.

99.     As the sole copyright registrant, Plaintiff owns the exclusive rights in 24 separate lyrical compositions at issue, the list of which is explicitly set forth in paragraph 2 herein.

100.    By the acts set forth above, IA has infringed Plaintiff's exclusive rights in each of the 24 lyrical compositions that are explicitly set forth in paragraph 2 herein, by preparing non-transformative derivative works, namely, downloadable digital copies of pre-existing physical print material containing the 24 lyrical compositions without any authorization in violation of 17 U.S.C. § 106(2).

Complaint

101.    At no time did IA have any authorization, permission, license, or consent to prepare derivative works or otherwise use Plaintiff's copyrighted works of which are explicitly set forth in paragraph 2 herein.

102.    Each such infringement by IA constitutes a separate and distinct act of infringement.

103.    IA's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.

104.    As a direct and proximate result of the infringements by IA, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), including in an amount ranging from $30,000 to $150,000 per each protected lyrical composition infringed, or in such other amount as may found to be proper under 17 U.S.C. § 504(c);

105.    Plaintiff is entitled to seek attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

### SIXTH CAUSE OF ACTION
### Contributory Infringement against IA

106.    Plaintiff repeats and realleges paragraphs 1-65 above as if fully set forth herein.

107.    As the sole copyright registrant, Plaintiff owns the exclusive rights in the 5 sound recordings/5 embodied musical compositions, and 1 additional musical composition all as set forth in paragraph 2 herein.

108.    By the acts set forth above, Plaintiffs' exclusive rights in each of the protected sound recordings and musical compositions as listed in paragraph 2 herein, were directly infringed by unlawful reproductions and distributions to IA by an alleged third-party "anonymous academic group" or some other currently unknown third-party or parties, in violation of 17 U.S.C. §§ 106.

109.    The reproductions and distributions by an alleged third-party "anonymous academic group" or some other currently unknown third-party or parties as described herein, lacked authorization, permission, license, or consent to reproduce and distribute.

- 36 -

Complaint

110.    IA is contributorily liable for the direct infringements of the alleged third-party "anonymous academic group" or some other currently unknown third-party or parties as described herein. By willfully accepting a hard drive in the mail from an anonymous third-party or parties that contained digital copies of nearly 500,000 sound recordings (including Plaintiff's as set forth in paragraph 2 herein) all fully-stripped of CMI and produced to IA without any evidence of an existing license or other authorization from Plaintiff for such distribution, IA had actual knowledge or at least red flag knowledge that ingesting said content onto its own servers, hosting said content, uploading copies, making such copies available to the general public at large for free streaming and permanent download through its websites constituted infringement, and thereby materially facilitated and contributed to the anonymous third-party or parties' infringements of same.

111.    Upon information and belief, IA knows the true identity of the allegedly "anonymous" party or parties that sent it the 1.1 terabyte collection of sound recordings that comprised/comprises its MySpace Dragon Hoard, and only has abetted the "anonymity" by reason that IA is aware that having accepted the allegedly "anonymous" party's distribution of approximately 500,000 sound recordings fully stripped of CMI and in which no valid license for their distribution and subsequent upload/re-distribution was provided to it, was likely unlawful conduct under the Copyright Act.

112.    By virtue of providing the storage facilities and hosting servers that enabled the anonymous third-party or parties' infringements via its unlawful reproductions and distributions of Plaintiff's sound recordings and musical compositions to IA, IA had the ability to stop the reproduction, distribution and public performance by means of a digital audio transmission of Plaintiff's protected sound recordings and musical compositions. IA failed to do so, and instead purposefully and knowingly facilitated, encouraged, and materially contributed to the infringements of same as described herein.

113.  Each infringement of Plaintiff's protected sound recordings and musical compositions constitutes a separate and distinct act of infringement.

114.  IA's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.

115.  As a direct and proximate result of the infringements by IA, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), including in an amount ranging from $30,000 to $150,000 per each protected sound recording and each protected musical composition infringed, or in such other amount as may found to be proper under 17 U.S.C. § 504(c);

116.  Plaintiff is entitled to seek attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a judgment in his favor and against Defendant as follows:

A.  For a declaration that Defendant has willfully infringed Plaintiff's protected sound recordings, musical compositions, and lyrical compositions as set forth in paragraph 2 herein;

B.  For statutory damages pursuant to 17 U.S.C. § 504(c) arising from Defendant's willful violations of Plaintiff's rights, including in an amount ranging from $30,000 to $150,000 per work infringed, or in such other amount as may found to be proper under 17 U.S.C. § 504(c);

C.  For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiff's protected sound recordings, musical compositions, and lyrical compositions, including a permanent injunction requiring that Defendant and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Plaintiff's exclusive rights under federal law, including without limitation all of the works set forth in paragraph 2 herein;

Complaint

1    D.  For an award of Plaintiff's costs and disbursements in this action, including any

2    reasonably incurred attorney's fees, pursuant to 17 U.S.C. § 505;

3    E.  For an award of pre-judgment and post-judgment interest, to the fullest extent available,

4    on any monetary award made part of the judgment against Defendants; and

5    F.  For such other and further relief as the Court deems just and proper.

6

7

8    **JURY DEMAND**

9    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby respectfully demands a jury

10   trial on all issues so triable in this action.

11

12   DATED: December 5th, 2025                         Respectfully Submitted,

13

14                                                    _____

15                                                    Anthony Martino
                                                      Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

28

- 39 -

Complaint

# EXHIBIT 1

# <u>List of Separately Infringed Works by Category/Title/Registration #</u>

## <u>A.) Sound Recordings</u>
1. Forgiven (SRu982-184, effective date of registration, 6/10/2009)
2. Is That So Wrong? (SRu982-184, effective date of registration, 6/10/2009)
3. All We've Got Is Now (SRu982-184, effective date of registration, 6/10/2009)
4. Your Moment, Your Life (SRu982-184, effective date of registration, 6/10/2009)
5. There's Gotta Be (SRu982-184, effective date of registration, 6/10/2009)

## <u>B.) Musical Compositions</u>
6. Forgiven (Pau3-406-761, effective date of registration, 1/14/2008)
7. Is That So Wrong? (Pau3-406-761, effective date of registration, 1/14/2008)
8. All We've Got Is Now (Pau3-406-761, effective date of registration, 1/14/2008)
9. Your Moment, Your Life (Pau3-406-761, effective date of registration, 1/14/2008)
10. There's Gotta Be (Pau3-406-761, effective date of registration, 1/14/2008)
11. Withdrawn (Pau3-406-761, effective date of registration, 1/14/2008)

## <u>C.) Lyrical Compositions</u>
12. Frozen In Love (SRu539-107, effective date of registration, 8/27/2003)
13. Can't Get Through (SRu507-366, effective date of registration, 3/7/2003)
14. Until We Meet Again (SRu507-366, effective date of registration, 3/7/2003)
15. Come To Life (SRu507-366, effective date of registration, 3/7/2003)
16. Deception (SRu507-366, effective date of registration, 3/7/2003)
17. Dreams (SRu507-366, effective date of registration, 3/7/2003)
18. Inevitable (SRu539-107, effective date of registration, 8/27/2003)
19. They're So Right (SRu507-366, effective date of registration, 3/7/2003)
20. Chasing Rainbows (SRu507-366, effective date of registration, 3/7/2003)
21. Married Man (SRu507-366, effective date of registration, 3/7/2003)
22. World Of Wonder (SRu507-366, effective date of registration, 3/7/2003)
23. Why Does She Cry? (SRu507-366, effective date of registration, 3/7/2003)
24. Forever Changed (SRU628-333, effective date of registration, 7/31/2006)
25. Growing Pains (SRU628-333, effective date of registration, 7/31/2006)
26. Note To Self (SRU628-333, effective date of registration, 7/31/2006)
27. Love Extinguisher (SRU628-333, effective date of registration, 7/31/2006)
28. Moat Around Your Heart (SRU628-333, effective date of registration, 7/31/2006)
29. Faces Change (SRU628-333, effective date of registration, 7/31/2006)
30. Just Don't Know (SRU628-333, effective date of registration, 7/31/2006)
31. Remember Me (SRU628-333, effective date of registration, 7/31/2006)
32. More Than You've Known (SRU628-333, effective date of registration, 7/31/2006)
33. The World Outside (SRU628-333, effective date of registration, 7/31/2006)
34. Re-Ignition (SRU628-333, effective date of registration, 7/31/2006)
35. Hopeful (SRU628-333, effective date of registration, 7/31/2006)

# EXHIBIT 2

# Myspace apologizes after losing 12 years' worth of music

By Matthew Robinson, CNN

⏱ 2 min read · Published 2:34 PM EDT, Mon March 18, 2019



ADVERTISEMENT



Martin Keene/AP

**(CNN)** — Social networking company Myspace has apologized for apparently losing 12 years' worth of music uploaded to its site, following a server migration error – a loss potentially amounting to 50 million songs.

The Los Angeles-based company, which was once a leading music-sharing platform, announced that content uploaded to its site from its inception in 2003 up until 2015 may no longer be accessible.

"As a result of a server migration project, any photos, videos and audio files you uploaded more than three years ago may no longer be available on or from Myspace," the company said in a statement on its website. "We apologize for the inconvenience."

ADVERTISING





**Winter Vacation: Hotel up to ~40% off**
Barceló Hotel Group - Sponsored

Book Now

Myspace was the most popular social media site between 2005 and 2008, before Facebook overtook it.



The site is credited with helping launch the careers of numerous artists, including Kate Nash. Matt Cardy/Getty Images Europe/Getty Images

The site is credited with helping launch the careers of numerous international artists, including Kate Nash, Arctic Monkeys and Calvin Harris, who were discovered on the platform.

It has nevertheless been in decline for years, failing to compete with other leading social media and music-sharing platforms including Facebook and YouTube, despite multiple redesigns of the site.

In 2009, the platform employed approximately 1,600 people. It now has a staff of 150, according to the company website.

Andy Baio, a tech expert and former chief technology officer of crowdfunding platform Kickstarter, warned that the music of up to 14 million artists may have been lost. The exact number of tracks lost has yet to be confirmed.

> **Andy Baio** · Mar 17, 2019                                         𝕏
> @waxpancake · Follow
> Myspace accidentally lost all the music uploaded from its first 12 years
> in a server migration, losing over 50 million songs from 14 million
> artists. x.com/textfiles/stat...
>
>> **Jason Scott** @textfiles
>> reddit.com/r/technology/c... Just in case you're wondering how it's
>> going.

**Andy Baio**
@waxpancake · Follow

I'm deeply skeptical this was an accident. Flagrant incompetence may be bad PR, but it still sounds better than "we can't be bothered with the effort and cost of migrating and hosting 50 million old MP3s."

12:16 AM · Mar 18, 2019                                              ⓘ

💜 1.1K      💬 Reply      🔗 Copy link

Read 66 replies

"Myspace accidentally lost all the music uploaded from its first 12 years in a server migration, losing over 50 million songs from 14 million artists," Baio wrote on Twitter.

CNN has contacted Myspace's data protection officer for comment.

Steven Battelle, the former lead vocalist of British rock band LostAlone, expressed sadness at the data loss and said the platform played a pivotal role in the establishment of his group.

"This makes me really sad, so much of the start of my band came from the exposure and community Mspace had," he wrote on Twitter. "I still think it was the best platform for artists / bands. Just music and people who loved the music commenting on it."

Rupert Murdoch's News Corporation bought Myspace in 2005 for $580 million. In 2011, it was sold to digital ad company Specific Media for just $35 million.

## Up next

**New BTS single 'Take Two' celebrates their 10th anniversary**
1 minute read



**BBC apologizes to Trump over editing blunder, rejects defamation claim**
4 minute read



**The Beats Pill speaker is finally back — and it's awesome**
6 minute read



**BBC leaders resign amid scandal over misleading edit of Trump speech**




# EXHIBIT 3

THOM TILLIS
NORTH CAROLINA

113 DIRKSEN SENATE OFFICE BLDG
WASHINGTON, DC 20510
PH: (202) 224-6342

https://tillis.senate.gov

**United States Senate**

WASHINGTON, DC 20510

COMMITTEES
ARMED SERVICES
BANKING, HOUSING, AND URBAN
DEVELOPMENT
JUDICIARY
VETERANS' AFFAIRS

## VIA ELECTRONIC TRANSMISSION

June 10, 2020

Mr. Brewster Kahle
Founder and Digital Librarian
Internet Archive
300 Funston Avenue
San Francisco, CA 94118

Dear Mr. Kahle:

I write to you again as Chairman of the Senate Judiciary Committee Subcommittee on Intellectual Property. In my April 8, 2020 letter, I expressed my concern that the Internet Archive's announcement of a National Emergency "Library" filled with 1.4 million books that had been digitized and made available to the public without restrictions and without the permission of copyright owners appeared to be a blatant infringement of thousands—if not more—of copyrights.[1] Indeed, the U.S. Copyright Office analyzed publicly available facts and concluded that though some works included in the National Emergency "Library" might be permitted under fair use, many would not be. The Copyright Office went on to say that "while the Internet Archive's goal of making research and educational materials publicly available may be laudable, so is respect for copyright."[2] I write now after learning that the Internet Archive is engaged in other initiatives that involve the unauthorized digitization and dissemination of copyright-protected creative works—in this case sound recordings.

According to a May 15, 2020 article in the *Seattle Times*, the Internet Archive has purchased Bop Street Records' full collection of 500,000 sound recordings with the "inten[t] to digitize the recordings and put them online, where they can be streamed for free."[3] It is not clear from the

---

[1] Since then, I understand that major American book publishers—Hachette Book Group, HarperCollins Publishers, John Wiley & Sons and Penguin Random House—filed a lawsuit alleging copyright infringement and seeking to enjoin uses of their copyrighted books in the National Emergency Library or the Internet Archive's "Open Library," which had offered the same catalog of books but with some limitations, such as checkout waitlists. *See Hachette Book Grp. v. Internet Archive*, No. 1:20–cv–04160 (S.D.N.Y. filed June 1, 2020).

[2] Letter from Maria Strong, Acting Register of Copyrights, U.S. Copyright Office, to Sen. Tom Udall, at 21 (May 15, 2020).

[3] Paul de Barros, *A Happy Ending for Seattle's Bop Street Records: A Nonprofit Buys Up the Entire Collection,* SEATTLE TIMES (May 15, 2020), https://www.seattletimes.com/entertainment/music/a-happy-ending-for-seattles-bop-street-records-a-nonprofit-buys-up-the-entire-collection/.

CHARLOTTE OFFICE:
9300 HARRIS CORNERS PKWY
SUITE 170
CHARLOTTE, NC 28269
PH: (704) 509-9087

RALEIGH OFFICE:
310 NEW BERN AVE
SUITE 122
RALEIGH, NC 27601
PH: (919) 856-4630

HIGH POINT OFFICE:
1840 EASTCHESTER DR
SUITE 200
HIGH POINT, NC 27265
PH: (336) 885-0685

GREENVILLE OFFICE:
1694 E ARLINGTON BLVD
SUITE B
GREENVILLE, NC 27858
PH: (252) 329-0371

HENDERSONVILLE OFFICE:
1 HISTORIC COURTHOUSE SQ
SUITE 112
HENDERSONVILLE, NC 28792
PH: (828) 693-8750

article, or others, if you intend to digitize all of the sound recordings acquired from Bop Street. But it is clear that these sound recordings were very recently for sale in a commercial record shop and likely contain many sound recordings that retain significant commercial value. This raises serious alarms about copyright infringement.

As I understand, Bop Street Records, which the *Wall Street Journal* once deemed a top-five record shop in the country, focuses on collectible-quality vinyl records across a diverse range of musical genres. According to its website, there sound recordings includes "Rock, Soul/R&B, Jazz, Blues, Classical, Country, World and many other genres from the 1920's to 1990's." The overwhelming majority—if not all—of these sound recordings are protected by U.S. copyright law, and thus may not be digitized and streamed or downloaded without authorization.

In a similar vein, I am aware of the Internet Archive's "Great 78 Project," which has already digitized—and continues to digitize daily—a vast trove of 78 rpm recordings, many of which are also commercially valuable recordings already in the marketplace, and has made those recordings available to the public for free through unlimited streaming and download. I understand that the Internet Archive is framing this and its other sound recording projects— which include both obscure gems for music fans and hits from the likes of Elvis Presley, Chuck Berry, and Johnny Cash—as preservation, but your current practices raise numerous potential issues of copyright infringement. The Bop Street collection is likely to add to that. Among other things, your sound recording projects do not appear to comply with the relevant provisions of the Orrin G. Hatch–Bob Goodlatte Music Modernization Act (MMA), which deals only with pre-1972 sound recordings and would not allow for streaming or downloading. Moreover, there are additional copyrights, such as the musical composition and the album artwork, that are displayed on the Internet Archive website and would not be covered by an exception for preservation.

I recognize the value in preserving culture and ensuring that it is accessible by future generations, such as the Library of Congress's Recorded Sound Collection and National Recording Registry projects. But I am concerned that the Internet Archive thinks that it—not Congress—gets to determine the scope of copyright law. With its sound recording projects, the Internet Archive does not even pretend that a national emergency like the Covid-19 pandemic creates a special need for these sound recordings to be freely streamed or downloaded. Rather, the Internet Archive seems to be daring copyright owners to sue to enforce their rights, or else effectively forfeit them—something many copyright owners, particularly individuals and smaller enterprises, cannot afford to do.

Our copyright system is designed with important limitations and exceptions that ensure that the public can make appropriate uses of copyrighted works even when the copyright owner seeks to prevent such uses—but those are the exception, and free use for those who disagree with the concept of exclusive rights is not one of them. Accordingly, I once again invite you to share with me the legal support, in copyright law or elsewhere, for reproducing and distributing copyrighted works that are owned by others. In particular, how do the Internet Archive's sound recording digitization and streaming projects—in particular the Great 78 Project—fit within case law interpreting the fair use doctrine and within the relevant provisions of section 108 and the MMA?

Please respond by July 10, 2020. If you have any questions, please do not hesitate to contact me.

Sincerely,

Thom Tillis
Chairman
Subcommittee on Intellectual Property

# EXHIBIT 4

Page 207

1   library, specifically looking for this Wolf Hall book,

2   would be presented with the donate button.  We can agree

3   on that; right?

4       A.  Yes.

5       Q.  And would you agree with me that this is another

6   way in which Internet Archive monetizes its lending

7   library web pages?

8           MS. LANIER:  Objection.  Scope, vague.

9           THE WITNESS:  That is a very broad

10  interpretation.

11      Q.  BY MR. BROWNING:  Of monetizing?  You know, if

12  you want to define it, but I mean, as I understand

13  monetize is makes money from, and what -- you know, do

14  you disagree with me that the donate button is not a way

15  to make money from the lending library?

16          MS. LANIER:  Same objection.

17          THE WITNESS:  It's -- the donate button takes

18  you to the general page of the Internet Archive, and it

19  doesn't mean that the money that's being given would

20  specifically go to the Open Library.

21      Q.  BY MR. BROWNING:  I understand that, but it will

22  go to Internet Archive.

23      A.  It will go to Internet Archive.

24      Q.  Okay.  So I'm going to have one more try at

25  this.  So would you agree with me that this web page is

Page 208

1    monetized?

2              MS. LANIER:  Objection.  Scope, vague.

3              THE WITNESS:  I mean, every single page of the

4    Archive is monetized.

5         Q.  BY MR. BROWNING:  Okay.  Mr. Cressaty, let's

6    move on.

7              MR. BROWNING:  Carl, there's going to be a jump

8    here.  Can we go to Tab 28, please?

9              MR. MAZUREK:  Yes.

10             (Exhibit 89, INTARC00138102, marked for

11             identification electronically by counsel.)

12             MR. MAZUREK:  It should be in the shared folder.

13        Q.  BY MR. BROWNING:  And before I pull -- or we

14   pull this up, Jacques, I have a question for you.  Do you

15   believe that Internet Archive is a public library?

16        A.  I do.

17        Q.  What is the basis for that belief?

18        A.  We make the books available to patrons for free.

19        Q.  Are you aware of Internet Archive being

20   accredited as a library by any governmental institution?

21        A.  Yes, I am.

22             MS. LANIER:  Objection.  Scope.

23        Q.  BY MR. BROWNING:  Who -- what -- tell me what

24   you know about that.

25             MS. LANIER:  Same objection.