1  Anthony Martino
   P.O Box 5558
2  Buffalo Grove, IL 60089
3  224-900-7695
   tonymartinomusic@gmail.com
4  Plaintiff

5

6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISON

11

12  ANTHONY MARTINO                 ) Case No. 3:25-cv-10538-RFL
                                    )
13                   Plaintiff,     ) **PLAINTIFF'S FIRST AMENDED**
                                    ) **COMPLAINT**
14        vs.                       )
                                    )
15  INTERNET ARCHIVE               ) Jury Trial Demanded
                                    )
16                   Defendant.     )
                                    )
17                                  )
                                    )
18                                  )
                                    )
19                                  )
                                    )
20  _____

21        Plaintiff Anthony Martino, appearing *pro se*, for his First Amended Complaint against

22  Defendant Internet Archive, alleges as follows, on personal knowledge as to matters relating to

23  himself and on information and belief as to all other matters.  This First Amended Complaint

24  supersedes and replaces the original Complaint in its entirety.

25                    **NATURE OF THE ACTION**

26        1. Plaintiff brings this civil action for damages under the Copyright Act, 17 U.S.C. § 101 *et*

27

28  *seq.*, arising from Defendant's direct copyright infringement of 59 copyrighted works, consisting of:

(a)  5 copyrighted sound recordings and the 5 copyrighted musical compositions embodied therein, infringed through Defendant's "MySpace Dragon Hoard" collection;

(b) 1 additional copyrighted musical composition infringed through Defendant's "MySpace Dragon Hoard" collection;

(c)  24 copyrighted musical compositions infringed by Defendant through (i) unauthorized reproduction and ingestion of Plaintiff's CDs via digital ripping, and (ii) scanning, creation of digital derivative files, reproduction, and public display of Plaintiff's printed lyrics contained in the CD liner notes;

(d)  24 copyrighted sound recordings corresponding to the same 24 musical compositions listed in subsection (c) above, which Defendant reproduced and ingested through CD ripping and digitization.

1(b). Plaintiff further asserts a claim for contributory copyright infringement against Defendant as to five sound recordings and six musical compositions referenced in paragraph 1 herein, which were infringed by third parties as a direct result of Defendant's material facilitation, enablement, and distribution of infringing files.

2.  A list of Plaintiff's separately infringed works as referenced in paragraphs 1 and 1(B) herein is attached hereto as **EXHIBIT 1** and incorporated herein by reference.

2(b).  All of the works listed in Exhibit 1 were registered with the U.S. Copyright Office prior to Defendant's infringing acts.  Certificates of Registration issued to Plaintiff by the U.S Copyright Office include: SRu507-366 (effective date of registration, March 7, 2003); SRu539-107 (effective date of registration, August 27, 2003); SRu982-184 (effective date of registration, June 10, 2009); PAu3-406-761 (effective date of registration, January 14, 2008); and SRu-628-333 (effective date of registration, July 31, 2006).

**PARTIES**

3.     Plaintiff, Anthony Martino, is an individual and resident of the state of Illinois.

3(b).     Plaintiff is, amongst other things, a singer/songwriter and independent recording artist of whom between 2004 and 2010 had licensed several of his original songs/sound recordings into shows on various television networks and for other commercial or media uses (including some of the works at issue in this suit), and had also released a limited amount of his music to the general public for commercial purposes under various stage names or pseudonyms ("Tony Martino", "The Martino Conspiracy", and "The Rarest Kind"). Plaintiff involuntarily postponed his music career indefinitely in or about mid-2011 due to medical reasons, and until recently, had only sporadically resumed on a very limited public basis.

4.     Defendant, Internet Archive (hereafter "IA"), is a not-for-profit corporation organized under the laws of California with its headquarters at 300 Funston Avenue, San Francisco, CA 94118.

4(b).     IA operates its primary website, archive.org, a massive digital library offering free access to digitized media such as websites, software, sound recordings, and print materials. Its Wayback Machine allows users to access archived versions of websites, containing hundreds of billions of web captures.  According to its website, its stated mission is to "provide Universal Access to All Knowledge."

## JURISDICTION AND VENUE

5.     This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1338(a) because it involves claims of copyright infringement. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law, namely the Copyright Act, 17 U.S.C. § 501 *et seq.*

6.    Jurisdiction is also otherwise proper in this Court pursuant to 28 U.S.C. §1332(a), because the Plaintiff and IA are citizens of different states and the amount in controversy exceeds $75,000.

7.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1400(a) because a substantial part of the events giving rise to the claims occurred in this District, IA resides in this District for venue purposes, and IA is subject to personal jurisdiction in this District.

8.    Plaintiff has standing to bring this action pursuant to 17 U.S.C. § 501(b).

9.    The copyright in all musical compositions, lyrical compositions, and sound recordings that are at issue in this matter were registered in the United States Copyright Office prior to the filing of this matter, thereby satisfying the registration requirement of 17 U.S.C. § 411(a).

10.    All of Plaintiff's copyrights were registered prior to IA's acts of infringement, entitling Plaintiff to seek statutory damages for each work infringed pursuant to 17 U.S.C. § 504 and to seek an award of attorney's fees pursuant to 17 U.S.C. § 505.

## FACTUAL BACKGROUND

11.    Upon public information and belief, between 2003 and 2010 www.myspace.com (hereafter "MySpace") was one of the largest social networking websites (if not the largest) in the world with over 100 million users.

12.    Upon personal knowledge and upon public information and belief, between 2003 and 2010 MySpace allowed for musicians, recording artists, and other users to create an Artist/Musician business profile page on its site for the purpose of then voluntarily uploading digital copies of their sound recordings embodying musical/lyrical compositions ("songs"). Third-party users of the general public could then stream any such uploaded recordings on-demand directly from the respective musician's/artist's/user's profile page on the site.

- 4 -

13.  Upon personal knowledge and upon public information and belief, between 2003 and 2010, MySpace also allowed artists and musicians the option of voluntarily offering their sound recordings/songs as permanent mp3 downloads to the general public directly from their respective profile page on the site (whether for free or for a monetary fee determined by the respective artist/musician or their record label).

14.  Upon personal knowledge and upon public information and belief, between 2003 and 2010, MySpace's then-applicable written terms and conditions permitted all artists/musicians and/or copyright owners that had uploaded sound recordings/songs to its site as set forth in paragraphs 12 & 13 herein, the right to instantaneously remove said sound recordings/songs from their respective profile pages on the site at any given time without notice so that they were no longer publicly accessible thereon to third-parties.  Any limited license granted to MySpace arising out of a copyright owner allowing for digital audio streaming of their uploaded recordings on its site was fully and immediately revocable upon the removal of such uploaded recordings by the copyright owner from their respective profile page, as the terms did not allow for MySpace to distribute the uploaded recordings to third-parties for use outside of MySpace's immediate online platform.

15.   Upon public information and belief, between 2003 and 2015, MySpace had hosted (on its servers) approximately 50 million songs/sound recordings as uploaded by over 14 million different musicians/recording artists and other users of its website.

15(b).   Plaintiff had voluntarily deleted/removed *any and all* of his recordings from his MySpace artist profile page by approximately the end of 2011 so that none were accessible to the general public, and had entirely ceased using the site in any meaningful capacity whatsoever shortly thereafter.

15(c).   Some of the recordings/musical compositions at issue in this suit as referenced in paragraphs 1 through 2(B) herein were never made publicly available by Plaintiff on MySpace at

any point in time whatsoever, nor did Plaintiff ever provide a license or other permission to any agent or other third-party to make any of his recordings available in any capacity on MySpace.

16. Upon public information and belief, in or about March of 2019, MySpace's corporate office publicly announced both on its website and to other worldwide media outlets that due to a botched "server migration" error of which had occurred sometime in 2018, MySpace had allegedly lost all of the sound recordings that had been uploaded to its website by musicians, artists and other users of its site between 2003 and 2015—a total loss of the approximate 50 million songs/recordings as referenced in paragraph 15 herein. *See, e.g., MySpace admits losing 12 years' worth of music uploads,* Published by CNN on March 18th, 2019 attached hereto as **EXHIBIT 2.**

17. Upon public information and belief, on or about April 3rd of 2019, an employee of IA, Jason Scott, of whom held/holds the position of Archivist and Software Curator, publicly announced in a series of posts made on his personal X profile page (formerly known as Twitter):

- "ANNOUNCING THE MYSPACE MUSIC DRAGON HOARD, a 450,000 song collection of mp3s from 2008-2010 on MySpace, gathered before they were all "deleted" by mistake. https://archive.org/details/myspace_dragon_hoard_2010 includes a link to a special custom search and play mechanism that lets you search and play songs."

- "This set of 450,000 songs was done by an anonymous academic group who were studying music networks and grabbed 1.3 terabytes of mp3s to study from MySpace in roughly 2008-2010 to do so. And someone asked me "hey, do you want these, since they were lost?"" Yes, yes I did.""

- If you have any lying around, hit me up. Also, please understand the Hobbit, the searcher that goes through the Dragon Hoard, can take a bit of time to spin up the

considerable search index. We're optimizing and fixing that search up, and it will all

be open-sourced. NOW DANCE."

These quotes are verified in the screenshots directly below:





1st Amended Complaint                                      Case No. 3:25-cv-10538-RFL

18.  Upon public information and belief, on or about August 11th of 2023, IA employee Jason Scott received a public inquiry on his personal X profile page (formerly known as Twitter) from an individual with the user name "Riza" regarding the content of the IA's MySpace Dragon Hoard content, stating "Unfortunately, I still haven't found the pieces I'm looking for. Do you have a blog post where you explain how you recovered this technically?"  In direct response to "Riza's" inquiry, Mr. Scott publicly responded on his X profile page to explain as follows: "Not directly. A group of academics took a core sample of mp3s from Myspace, and years later, realized they still had the drive of them, and mailed it to me anonymously."  These quotes are verified in the below screenshot, herein:



19.  In a separate public post made in the comment section of the MySpace Dragon Hoard section of IA's website on or about July 23rd, 2023, Mr. Scott further clarified his direct involvement in the uploading of the 500,000 sound recordings to the IA website while acting within the scope of his employment by IA, stating: "This is Jason Scott, the person who helped coordinate the Dragon Horde being uploaded, as well as the Hobbit finder by James Baicoianu. The songs in the Hoard are the songs we have. There are no more in the "back room". Regarding the reviews asking after or about other songs or artists you wish to find: feel free to leave them. They can be

used by others who might have copies, or if more song hoards become available, checked against."

These quotes are verified in the below screenshot, herein:



20.  Essentially, as part of what IA has titled "The Myspace Dragon Hoard (2008–2010)" collection, IA itself—via the agency of its own employees acting within the scope of their employment and/or via its own contracted content-moderators acting with IA's explicit permission and authority—directed and uploaded/reproduced low-resolution (96 kbps, 22 kHz) MP3 copies of approximately 500,000 sound recordings originating from MySpace. These MP3 files were purportedly obtained by IA employee Jason Scott on a hard drive mailed to him by an allegedly "anonymous" party or parties, as referenced in paragraphs 17–19 herein, and were then uploaded by IA to a designated area of IA's own primary website at:

https://archive.org/details/myspace_dragon_hoard_2010.

20(b).    Upon information and belief, the allegedly "anonymous academic group" (or whomever the true party was/is that provided the hard drive to IA) used an automated computer process of some kind (e.g., web scraping, writing scripts for API downloading, etc.) to amass the approximate 500,000 song collection of downloaded sound recordings from MySpace's servers (where the recordings were originally hosted), and this process ultimately resulted in the creation of

the digital MP3 files that IA later obtained from the allegedly anonymous party and uploaded to its own servers as its "MySpace Dragon Hoard Collection."

21.    Of the approximate 500,000 sound recordings/songs that IA received from the alleged "anonymous academic group" and subsequently uploaded/reproduced as MP3 copies to its website as explicitly referenced in paragraph 20 herein, the notoriety of the artists/musicians ranges the gamut, from thousands of copyrighted songs by current and massively popular recording artists such as Taylor Swift, Beyonce, Lady Gaga, Adele, and John Mayer, to legacy artists such as The Beatles, The Beach Boys, Marvin Gaye, and Elvis Presley, to recordings by independent and/or otherwise lesser-known recording artists.  Moreover, taken as a whole collection, no reasonable actor in the digital music space, including IA, could conclude that such material was lawfully authorized for free distribution by and from any "anonymous" third-party that had allegedly compiled and mailed copies on a hard drive.

22.  Through its primary website (as stated in paragraph 20 herein), IA made all of the approximate 500,000 sound recordings & songs comprising its MySpace Dragon Hoard Collection available to the general public for free and unlimited permanent download as a 1.1-terabyte digital MP3 collection, which could be downloaded either in its entirety or in smaller batches (thousands of recordings) via 144 separately numbered zip (.zip) folders, as shown in the screenshot below. This collection included five (5) of Plaintiff's copyrighted sound recordings and the five (5) musical compositions embodied therein, as well as one (1) additional copyrighted musical composition— eleven (11) works in total—all as referenced in subsections 1(a) and 1(b) of this First Amended Complaint (collectively, "Plaintiff's MySpace Dragon Hoard Works"):

23.  Furthermore, upon information and belief, every single one of the approximate 500,000 sound recordings/songs that were uploaded/reproduced by IA and comprise its "MySpace Dragon Hoard Collection" on its primary website were uploaded/reproduced without any copyright management information ("CMI") whatsoever as the term is defined in 17 U.S. Code § 1202(c), such as the name of the performing artist, song title, publisher, author/composer, album title, record label, ISRC code ("International Standard Recording Code"), and/or copyright year—all items of which would normally be embedded as metadata on authentic digital copies authorized by a copyright owner or artist's record label as standard practice in the recording industry for the purpose of tracking usages and collecting associated revenue therefrom.

24.  Instead, IA's uploaded reproductions of each sound recording in Plaintiff's MySpace Dragon Hoard Works were distributed with file names consisting of 36 seemingly random or auto-generated characters (letters, numbers, and/or symbols) followed by the extension ".mp3," and without any embedded copyright management information. For example, Plaintiff's MySpace Dragon Hoard Works were uploaded and reproduced by IA and made available to the general public as free and unlimited permanent MP3 downloads within four separately numbered zip folders (#76,

#77, #84, and #86) on IA's public website, as referenced in paragraphs 20 and 22 herein, using the following file names:

std_72ea6c8562d82c69c16d3095e5125fbc.mp3

std_3e4bbb5e4b18d9d53f51ef2f42abb670.mp3

std_6c84b7eb17956e0fa2d016ec7a39f1cc.mp3

std_0566f35bd764b127f4a8342c14546d8f.mp3

std_3101d4d0e70a991ec6b4531c4ae364f7.mp3

std_756409e9767e18ad7bfcc5eb4bb6a50c.mp3

24(b).    Furthermore, metadata inspection using ExifTool (version 13.41) confirms that IA's digital reproductions of Plaintiff's MySpace Dragon Hoard Works were stripped of substantially all copyright management information ("CMI") of the types identified in paragraph 23 herein—information that is customarily embedded in commercially released digital sound recordings—including but not limited to song titles, artist name, album title, copyright year, publisher name, performing rights organization information, and ISRC codes. Representative ExifTool results for a sound recording included within Plaintiff's MySpace Dragon Hoard Works are shown in the screenshots directly below:

1st Amended Complaint                                                    Case No. 3:25-cv-10538-RFL





24(c).   By contrast, an authentic and previously authorized digital copy of the same sound recording corresponding to IA's file std_72ea6c8562d82c69c16d3095e5125fbc.mp3 contains

embedded CMI identifying, among other things, the song title, artist name, album title, copyright year, publisher information, and ISRC code, as shown in the screenshots directly below:

1st Amended Complaint                                    Case No. 3:25-cv-10538-RFL

```
ItemVendorID                : 0x000014dc
Platform                    : 0x00000001
VersionRestrictions         : 0x01010100
TransactionID               : 0xc7729de6
ItemID                      : 0x1450178f
ItemTool                    : P307
MediaFlags                  : 0x00000001
ModeFlags                   : 0x00000000
UserName                    : Frank Martino
HandlerType                 : Metadata
HandlerVendorID             : Apple
iTunSMPB                    : 0 040 3C0 CC3000 0 0 0 0 0 0 0
VolumeNormalization         : 1CDE 1818 7F93 6957 3F211 31849 7FFE 7FFE 28582 11806
Title                       : All We've Got Is Now
Artist                      : Tony Martino
AlbumArtist                 : Tony Martino
Album                       : Slightly Defined
Genre                       : Pop
TrackNumber                 : 7 of 10
DiskNumber                  : 1 of 1
Compilation                 : No
PlayGap                     : Insert Gap
ContentCreateDate           : 2010:01:12 00:00:00Z
AppleStoreAccount           : hemitman@aol.com
Copyright                   : © 2010 Tony Martino Music/ASCAP Copyright
Rating                      : none
ArtistID                    : 277431179
AlbumID                     : 340793050
GenreID                     : Music;Pop
AppleStoreCountry           : United States
AppleStoreAccountType       : iTunes
MediaType                   : Normal (Music)
PurchaseDate                : 2010-01-12 21:45:10
ISRC                        : DittoMusic:isrc:USNFK0900007
Asset-InfoFlavor            : 2:256
CoverArt                    : (Binary data 186414 bytes, use -b option to extract)
MediaDataSize               : 9097096
MediaDataOffset             : 612741
AvgBitrate                  : 261 kbps
TONY@Anthonys-Macbook-Pro ~ %
```

25.    At some point in time after IA initially made its MySpace Dragon Hoard collection available to the general public as described in paragraph 22 herein, IA created and launched a separate companion website (www.lostmyspace.com) dedicated entirely to further distributing the collection. This website features a music streaming player and allows visitors to this site to search for songs and artists, and to stream and permanently download (as mp3 files) any of the recordings in its collection on an unlimited basis, individually, in full, and for free.

25(b).    Upon information and belief, the search, streaming, and MP3 download functionality of IA's separate site, www.lostmyspace.com, was developed with the assistance of volunteers who were solicited by IA employee Jason Scott, including an individual named James Baicoianu, further demonstrating that the MySpace Dragon Hoard collection and its accessibility to the general public were directed and facilitated by IA itself, rather than by any random third-party user.

25(c).    In fact, a public posting made by this individual (Mr. Baicoianu) on Hacker News' website (http://news.ycombinator.com/) on April 6, 2019 as shown in the below screenshot (with blue arrow annotation) states: "Hi, author of the utility here. Yeah there wasn't a repo yet when we went live, I whipped the whole thing up in a night when Jason put out a request for helpers.  I've now published the code for this player to Github, it's available at https://github.com/jbaicoianu/ia-myspace-music-search - pull requests welcome!  Still figuring out which license [Archive.org]

1st Amended Complaint                                                      Case No. 3:25-cv-10538-RFL

1  wants (I'm just a volunteer). I've also added a download link to the player so its easier to get at the

2  original mp3s now…". This public statement further confirms IA's direct involvement in building

3  tools specifically designed to enable mass streaming and downloading of infringing recordings.



26.    All of Plaintiff's MySpace Dragon Hoard Works—consisting of five (5) sound

recordings, the five (5) musical compositions embodied therein, and one (1) additional musical

composition—as referenced in subsections 1(a) and 1(b) herein, were made available by IA on its

separate website, www.lostmyspace.com, as referenced in paragraph 25 herein, and were both fully

streamable and downloadable as individual MP3 files for free and on an unlimited basis, as shown

in the screenshot below:

1st Amended Complaint                                                    Case No. 3:25-cv-10538-RFL



27.     At no point in time did Plaintiff ever make any of Plaintiff's MySpace Dragon Hoard Works available to the general public for free permanent download through his former artist profile page on MySpace or anywhere else on MySpace, nor did Plaintiff ever authorize or permit any third parties to do so.

28.     Certain of Plaintiff's MySpace Dragon Hoard Works, as referenced in subsections 1(a) and 1(b) herein, were—and remain—unpublished and have never been made publicly available in any capacity anywhere in the world (including on MySpace). Accordingly, IA's reproduction and distribution of those particular works constituted their initial publication, and it is currently unknown to Plaintiff how any such unpublished works could have originated on any hard drive that IA or its employees allegedly obtained for purposes of sourcing content for the MySpace Dragon Hoard collection.

29.     Plaintiff first learned of IA's infringement of Plaintiff's MySpace Dragon Hoard Works in or about March of 2024, when an Illinois resident informed Plaintiff that during that month he had discovered Plaintiff's works on IA's website www.lostmyspace.com, as referenced in paragraph 26 herein, and that he was able to fully stream and permanently download each of those works directly from IA's servers.

1st Amended Complaint                                                Case No. 3:25-cv-10538-RFL

30.    Thereafter, Plaintiff mailed, via the United States Postal Service, three separate written takedown notices to IA at the designated Copyright Agent address expressly listed on IA's own website, as shown in the screenshot below (with blue arrow annotation):



31.    Plaintiff mailed the first takedown notice in or about March 2024 via standard U.S. Mail; the second via USPS Certified Mail (tracking no. 9514806601264323015390) on November 18, 2024; and the third via USPS Certified Mail (tracking no. 9514806601365006377887) on January 6, 2025.

32.    IA received Plaintiff's two certified mailings as set forth in paragraph 31 herein on November 27, 2024 and January 13, 2025, respectively. Both mailings were signed for by an individual at IA's listed Copyright Agent address, as referenced in paragraph 30 herein and as confirmed in the screenshots below:





33.    Having received no response from IA, on January 18, 2025 Plaintiff sent a follow-up email to IA through the support desk email address (info@archive.org) listed on IA's primary website. In that email, Plaintiff attached a copy of his most recent certified letter dated January 6, 2025, together with exhibits, which IA had previously received at its Copyright Agent address on January 13, 2025.

34.    Despite Plaintiff's repeated written takedown requests beginning in March 2024, IA failed and refused to remove Plaintiff's MySpace Dragon Hoard Works from its two websites, as referenced in paragraphs 30 through 33 herein, until on or about January 28, 2025, when an individual identified as Chris Butler, with the stated title of Office Manager, emailed Plaintiff and advised that the content had finally been disabled from public access.

1st Amended Complaint                                    Case No. 3:25-cv-10538-RFL

1

2

**ADDITIONAL INFRINGEMENTS INVOLVING 24 MUSICAL COMPOSITIONS AND 24 SOUND RECORDINGS**

3        35.      In or about mid-March 2025, Plaintiff first learned that IA had infringed additional

4   copyrighted works beyond the eleven (11) works contained in IA's MySpace Dragon Hoard

5   collection. Specifically, Plaintiff was informed by an Illinois resident that IA had scanned physical

6   copies of two of Plaintiff's prior CD albums—one of which was an unauthorized counterfeit

7   pressing of an official release—uploaded digital reproductions of each CD's printed liner notes

8   (containing twenty-four (24) of Plaintiff's copyrighted song lyrics) into IA's digital collections,

9

10  created derivative digital copies of those materials in downloadable PDF format (using

11  LuraDocument PDF Compressor v2.68), and publicly displayed and distributed those materials on

12  IA's website without Plaintiff's authorization.

13       35(b).  Plaintiff later learned, upon further investigation, that IA's conduct was not limited to

14  the scanning and public display of printed lyrics. Plaintiff is informed and believes, and on that

15  basis alleges, that in connection with the same two CD albums referenced in paragraph 35 herein,

16
    IA also reproduced and ingested the underlying audio content of those CDs through a process of
17
    digital ripping and digitization, including through software identified on IA's website as
18
19  "ArchiveCD Version 2.1.52" as shown in the screenshot accompanying this paragraph, which upon

20  information and belief is a tool used by IA for digitization and audio extraction.  The creation of

21  such digital audio files constitutes reproduction within the meaning of 17 U.S.C. § 106.

22

23

24

25

26

27

28

- 20 -

35(c).  Plaintiff is further informed and believes that IA created and stored digital audio files derived from Plaintiff's CDs and generated audio samples of the recordings, as indicated by IA's website statements that each album was "available with audio samples only," as shown in the screenshots accompanying this paragraph.  As a result of this conduct, IA reproduced without license or authorization: (i) twenty-four (24) copyrighted musical compositions embodied on those CDs, and (ii) twenty-four (24) corresponding copyrighted sound recordings fixed therein—forty-eight (48) separate copyrighted works in total.  Such reproductions constitute actionable infringement regardless of whether the resulting audio files were ever ultimately made publicly accessible.





35(d).    Plaintiff is further informed and believes, and on that basis alleges, that in connection with IA's scanning and digitization of Plaintiff's printed CD liner notes and lyrics as described in paragraphs 35 through 35(c) herein, IA failed to preserve or carry forward copyright management information ("CMI") associated with those works. Specifically, Plaintiff's original liner notes and

lyric sheets contained CMI including, but not limited to, song titles, author/composer credits, copyright notices, copyright years, record label, and publishing information. When IA created derivative digital PDF files from those materials, IA failed to embed or otherwise fully include all such CMI in the resulting digital files or their associated metadata fields. As a result, IA created and distributed digital copies of Plaintiff's lyrical and musical composition works that were devoid of CMI that was present on the original physical materials.

35(e).    Plaintiff is informed and believes, and on that basis alleges, that IA knew or had reasonable grounds to know that distributing digital PDF reproductions of Plaintiff's lyrics and liner notes without carrying forward the original CMI would conceal infringement and make it more difficult for Plaintiff to identify, track, or enforce his rights in those works, and would enable or facilitate downstream infringement by third parties who downloaded or further redistributed the digitized files.

35(f).    Upon information and belief, the "audio samples only" files created by IA from Plaintiff's sound recordings as referenced in paragraph 35(c) constitute unauthorized derivative works. Specifically, IA created shortened, truncated, edited, or otherwise modified digital audio files derived from Plaintiff's full-length sound recordings. These files were distinct new audio versions that differed in duration and content from the original recordings and were not mere identical copies, but rather digital adaptations that recast and transformed Plaintiff's copyrighted sound recordings without authorization.

36.    The infringing acts described in paragraphs 35 through 35(f) herein—including the scanning of Plaintiff's printed liner notes, the creation of derivative PDF files, the public display of Plaintiff's lyrics, and the ripping and digital ingestion of Plaintiff's sound recordings—were not performed by random third-party users of IA's website from the general public, but rather by IA itself through the agency of its own employees, partners, interns, volunteers, content moderators,

and/or other authorized contributors acting within the direct scope of IA's digitization and collection activities and under IA's direction and control.  Specifically, the individuals associated with these infringing uploads and digitization activities include, but are not limited to, accounts identified as associate-kithan-ma@archive.org, associate-mariorenier-teano@archive.org, and associate-yuenyee-ming@archive.org, as shown in the screenshots below:

1st Amended Complaint

36(b). Plaintiff is informed and believes, and on that basis alleges, that the digital ripping and ingestion of the audio content from Plaintiff's two CDs necessarily resulted in the creation of new unauthorized digital copies of Plaintiff's copyrighted sound recordings and the musical compositions embodied therein. The act of copying and ingesting those recordings onto IA's servers constitutes direct infringement under 17 U.S.C. § 106. Moreover, IA's website expressly represented that each album was "available with audio samples only," as shown in the screenshots referenced in paragraph 36 herein, demonstrating that IA created unauthorized derivative works in the form of modified digital audio samples derived from Plaintiff's copyrighted sound recordings.

37.    In fact, the three individuals referenced in paragraph 36 herein who scanned and digitized Plaintiff's two CDs onto IA's website did not do so from general public user-registration accounts, but rather using elevated-privilege accounts identified as IA's "associate accounts," which upon information and belief are internally provisioned accounts approved by IA and tied to official digitization or cataloging work of IA itself, and over which IA has the ability to exercise control, particularly as it concerns the curation of content for its public website.

38.    Specifically, upon information and belief, IA creates its "associate accounts" solely for its own employees/interns, content-moderators/curators, staff members, and project collaborators, or it grants access to these accounts only to its verified partners (such as other

1st Amended Complaint                                          Case No. 3:25-cv-10538-RFL

libraries, archives, or media preservation groups), as users of these associate accounts are able to upload content directly into curated collections on IA's website, which ordinary registered users of IA's website from the general public cannot access or modify.

38(b). At no time did Plaintiff grant IA any license, permission or other authorization to scan, digitize, ingest, reproduce, display, distribute, or create derivative works from the CDs at issue, the sound recordings, or the musical compositions described in paragraphs 35 through 38 herein, including either the printed lyrics or the sound recordings embodied on those CDs.

39.    At all relevant times, IA had actual knowledge or at least reasonable grounds to know, that a substantial portion of the approximately 500,000 sound recordings it received on a hard drive from an anonymous third party were protected by copyright law, including Plaintiff's copyrighted sound recordings and the musical compositions embodied therein. Nevertheless, IA performed no investigation of any kind into the copyright status of any of the recordings before ingesting the content and making the entire collection available to the general public for free permanent download and on-demand streaming through its websites as described in paragraphs 20–22 herein.

40.    At all relevant times, IA knew that its practice of uploading copyrighted sound recordings and the musical compositions embodied therein to its website and making them available to the general public for unlimited streaming and permanent downloading without any license or authorization posed a substantial risk of infringement. In fact, in 2020, IA's founder and director Brewster Kahle publicly acknowledged that building an audio library "is doable. Except that it's a very heavily litigated area," and that "[e]xactly how to do the distribution on the commercial materials, we haven't quite figured out." Long Now Foundation, Universal Access to All Knowledge, YOUTUBE, https://www.youtube.com/watch?v=RV_ALlJGU_c (May 25, 2020) (Brewster Kahle speaking & 27:30).

41.  Furthermore, IA was actually notified that its various business activities concerning its offering of free sound recordings to the general public for unlimited free downloading and streaming was potentially infringing. On June 10, 2020—just over a year after IA had launched its MySpace Dragon Hoard project—Senator Thom Tillis, then-Chair of the Senate Subcommittee on Intellectual Property, wrote a letter to Mr. Kahle and IA referencing that IA's practice of "ma[king] recordings available for free through unlimited streaming and download . . . raise numerous potential issues of copyright infringement." Letter from Sen. Thom Tillis to Brewster Kahle (Jun. 10, 2020) 2.  Senator Tillis added that "I am concerned that the Internet Archive thinks that it—not Congress—gets to determine the scope of copyright law. . . . Internet Archive seems to be daring copyright owners to sue to enforce their rights, or else effectively forfeit them—something many copyright owners, particularly individuals and smaller enterprises, cannot afford to do." Id.  Tillis Letter to Internet Archive attached hereto as **EXHIBIT 3.**

42.    At all relevant times, IA had actual knowledge, or at least reasonable grounds to know, that Plaintiff's works identified in paragraphs 1 through 2(B) herein—including Plaintiff's copyrighted sound recordings, the musical compositions embodied therein, and Plaintiff's lyrical compositions—were legally protected by copyright law, and that licenses or other authorization were required in order to reproduce, distribute, publicly display, or publicly perform those works.

42(b).   IA also had actual knowledge, or at least red-flag knowledge, that any anonymous third party offering to provide nearly 500,000 MP3 files originating from MySpace on a hard drive could not lawfully authorize IA to reproduce, distribute, publicly display, or publicly perform those recordings and compositions without valid licenses from the respective copyright owners. IA knew or should have known that the absence of verifiable licensing agreements or other documentation rendered any such mass distribution plainly unauthorized.

1st Amended Complaint                                    Case No. 3:25-cv-10538-RFL

42(c).    With respect to the additional infringements described in paragraphs 35 through 38 herein, IA likewise knew or had reason to know that scanning Plaintiff's printed CD liner notes, creating derivative PDF files, and digitally ripping and ingesting the audio content of Plaintiff's CDs would require authorization from Plaintiff as the copyright owner. IA nonetheless proceeded to reproduce, store, and utilize those materials without any license, permission, or inquiry, demonstrating willful disregard for Plaintiff's rights.

43.    At all relevant times, IA had actual knowledge, or at a minimum reason to know, that the anonymous third party who provided it with a hard drive containing Plaintiff's sound recordings and the musical compositions embodied therein—as referenced in paragraphs 1(a) and 1(b) herein—possessed no license, permission, or other legal authorization from Plaintiff to reproduce or distribute those works.

44.    At all relevant times, IA knew that it possessed no license, permission, or other authorization from Plaintiff—or from any agent or entity authorized to act on Plaintiff's behalf—to reproduce, distribute, publicly display, or publicly perform any of Plaintiff's copyrighted works identified in paragraphs 1 through 2(B) herein. Despite this knowledge, IA nonetheless intentionally reproduced and distributed Plaintiff's works without authorization and further facilitated ongoing infringement by third parties through its websites and services.

45.    Upon information and belief, IA generates substantial annual revenue, including millions of dollars in monetary donations from the general public. IA's practice of offering free access to copyrighted content—including sound recordings, books, and other media that IA does not own—serves as an enticement for such donations and as a means of driving continued traffic to its websites for commercial benefit.

46.    In fact, IA's former Director of Finance, Jacques Cressaty, testified under oath on October 22, 2021 in the copyright litigation matter of *Hachette Book Group, Inc. v. Internet*

*Archive*, No. 20-cv-4160 (JGK), 664 F.Supp.3d 370 (S.D.N.Y. 2023), that "every single page of the Archive is monetized." (McN Decl. ¶61; Jacques Cressaty Dep. Tr. 207:1–208:4), attached hereto as **<u>EXHIBIT 4.</u>**

47.    Consistent with IA's practice of soliciting monetary donations in exchange for free access to digital content, the webpages through which IA distributed Plaintiff's works—including the MySpace Dragon Hoard collection—prominently displayed banners requesting monetary donations from visitors, as shown in the screenshots directly below:







47(b). IA likewise knew, or at a minimum had reason to know, that scanning Plaintiff's printed CD liner notes and digitally ripping and ingesting the audio content of Plaintiff's CDs—as described in paragraphs 35 through 38 herein—required authorization from Plaintiff as the copyright owner. IA proceeded to reproduce, store, display, and create derivative digital files from those materials without making any inquiry to Plaintiff or seeking any license, further evidencing willful disregard for Plaintiff's exclusive rights.

48.     IA willfully ingested, copied, and distributed the approximately 500,000 sound recordings comprising its MySpace Dragon Hoard project—including Plaintiff's works identified in paragraphs 1(a) and 1(b) herein—without any license or authorization and in disregard of existing copyright law and the rights of the copyright owners whose works make up the collection. A substantial portion of the collection consists of recordings by independent or lesser-known artists that may not have the means or ability to enforce copyrights, a fact that IA knew or reasonably should have known at the time it undertook this project.

49.     Upon information and belief, IA possesses exclusive knowledge of the exact number of visitors who downloaded the entire 1.1-terabyte MySpace Dragon Hoard collection—which included Plaintiff's works—as well as the number of visitors who downloaded any of the individual zip folders that contained Plaintiff's recordings, as described in paragraph 24 herein. IA likewise possesses records of how many times Plaintiff's works were streamed or individually downloaded through its websites. As of the filing of this First Amended Complaint, the public download area for the MySpace Dragon Hoard collection reflects a total view count in excess of 200,000, as shown in the screenshot below:

1st Amended Complaint                                    Case No. 3:25-cv-10538-RFL



50.     Moreover, some members of the general public who downloaded the MySpace Dragon Hoard collection from IA—both within the United States and internationally—have engaged in further downstream infringement by re-uploading the collection to their own servers and making it available for unlimited streaming and permanent download through independent websites and services. Such downstream infringement was a foreseeable and natural consequence of IA's conduct and forms part of the basis for Plaintiff's contributory infringement claim.

51.     For example, upon information and belief, an individual located in Switzerland publicly posted on the social media platform Reddit in or about 2019 that he had downloaded the entire MySpace Dragon Hoard collection from IA, created a torrent file from the collection, and added a search engine allowing users to directly stream and download the recordings from an independent website located at https://cable.ayra.ch/myspace/, as shown in the screenshots below:



52.    As shown in the screenshot below, the user referenced in paragraph 51 herein downloaded from IA's website all of Plaintiff's works contained within the MySpace Dragon Hoard collection—namely, the five (5) sound recordings and five (5) musical compositions embodied therein, as well as the one (1) additional musical composition—identified in paragraphs 1(a) and 1(b) herein. That user then made those works available for further streaming and permanent download on his own website, thereby engaging in downstream infringement directly facilitated by IA's conduct.



52(b).   The downstream redistribution of Plaintiff's works by third parties, as described above, was a direct and foreseeable result of IA's unauthorized copying and distribution. Such secondary dissemination further expanded the scope of infringement, diminished the market value of Plaintiff's works, and made it substantially more difficult for Plaintiff to police and enforce his copyrights.

53.   In a further example of downstream infringement, upon information and belief, another member of the general public located in Minneapolis, Minnesota downloaded the entire 1.1-terabyte MySpace Dragon Hoard collection from IA's website and re-uploaded the collection to his own website known as "MyDora" (https://mydora.restorativland.org/). That website features a continuous music streaming player containing every song in the collection, filterable by genre, and allowed visitors to stream and permanently download individual MP3 files for free and on an unlimited basis, as shown in the screenshots below:

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17
18
19



20
21
22
23
24
25
26
27
28



1st Amended Complaint                                    Case No. 3:25-cv-10538-RFL

54. All of Plaintiff's works contained within the MySpace Dragon Hoard collection—namely, the five (5) sound recordings, the five (5) musical compositions embodied therein, and the one (1) additional musical composition, as identified in paragraphs 1(a) and 1(b) herein—were individually streamed and downloaded from the MyDora website referenced in paragraph 53 by an Illinois resident in March of 2024 and again in March of 2025.

55. A metadata inspection using ExifTool (version 13.41) confirms that the copies of Plaintiff's recordings downloaded from the MyDora website originated directly from IA's MySpace Dragon Hoard collection. The files are identical between the two sources, including identical file names and identical absence of embedded metadata, as shown in the comparison table below:

| Field / Property | Apple iTunes (Official) | Internet Archive (Downloaded) | MyDora (Streamed) |
|---|---|---|---|
| File Name | 07 All We've Got Is Now.m4a | std_72ea6c8562d82c69c16d3095e5125fbc.mp3 | std_72ea6c8562d82c69c16d3095e5125fbc.mp3 |
| File Size | 11 MB | 3.6 MB | 3.6 MB |
| Bitrate | 261 kbps | 96 kbps | 96 kbps |
| Sample Rate | 44100 Hz | 22050 Hz | 22050 Hz |
| Duration | 0:05:04 | 0:05:04 | 0:05:04 |
| Artist | Tony Martino | N/A | N/A |
| Album Artist | Tony Martino | N/A | N/A |
| Copyright / CMI | ℗ 2010 Tony Martino Music / ASCAP | False | False |
| ISRC | DittoMusic:isrc:USNFK0900007 | N/A | N/A |
| Original Media Flag | N/A | False | False |
| Where From Metadata | N/A | http://lostmyspace.com/ https://ia800900.us.archive.org/view_archive.php?archive=/3/items/myspace_dragon_hoard_2010/86.zip&file=86%2Fstd_72ea6c8562d82c69c16d3095e5125fbc.mp3 | aboutjclient https://mydora.restorativland.org/songs/86/std_72ea6c8562d82c69c16d3095e5125fbc.mp3 |

56. As the comparison table in paragraph 55 herein demonstrates, the copies of Plaintiff's sound recordings distributed by IA and subsequently redistributed through the MyDora website contain no embedded copyright management information ("CMI") whatsoever. By contrast, an authentic digital copy of the same recording previously distributed through authorized channels (such as Apple iTunes) contains numerous categories of embedded CMI, including song title, artist

name, album title, copyright year, publishing company, distributor information, ISRC code, and performing rights organization information.

57.     Likewise, authentic and authorized digital copies of Plaintiff's other four (4) sound recordings and one (1) additional musical composition referenced in paragraphs 1(a) and 1(b) herein contain the same categories of embedded CMI described in paragraph 56, whereas the copies reproduced and distributed by IA and the MyDora website contain no such information.

58.     Upon information and belief, all of the approximately 500,000 sound recordings that IA copied, uploaded, and distributed as part of its MySpace Dragon Hoard collection—including Plaintiff's works—contain no embedded copyright management information of any kind.

59.     Upon information and belief, at the time IA received the hard drive allegedly containing approximately 500,000 sound recordings and before uploading that content to its own servers and website, IA knew or reasonably should have known that the recordings had been compressed to lower audio quality and were entirely devoid of embedded CMI.

60.     Upon information and belief, the absence of embedded CMI in the recordings comprising the MySpace Dragon Hoard collection resulted either from (a) removal or alteration by IA itself during ingestion or processing, (b) removal or alteration by the third party that provided the recordings to IA, or (c) removal or alteration by MySpace at the time the recordings were originally uploaded. Regardless of the precise mechanism, IA knowingly reproduced and distributed recordings that lacked all categories of CMI.

61.     Nowhere on IA's primary website within the section dedicated to the MySpace Dragon Hoard collection, nor on its companion website www.lostmyspace.com, did IA post any disclaimers, warnings, or notifications to users that the sound recordings being offered—including Plaintiff's works—were likely protected by copyright or that downloading and redistributing them could constitute infringement. By offering the recordings without any such notice, IA implicitly

represented to users that it possessed the legal right to distribute the recordings and that users were authorized to stream and download them.

62.    As an organization that regularly digitizes, handles, and distributes digital audio recordings to the general public, IA knew or had reasonable grounds to know that distributing sound recordings from which all embedded CMI had been removed would likely conceal infringement and would enable and facilitate downstream infringement by third parties who downloaded and redistributed those recordings.

63.    As a library that regularly handles and offers digital audio recordings to the general public, IA was fully aware of the relevance of ISRC codes as CMI to sound recordings, such as that ISRC codes distinguish one recording or version from another; that they are used by streaming services (e.g., Spotify, Apple, Tidal, etc.), collection societies (e.g., PPL, SoundExchange), broadcasters, and content sharing websites such as YouTube, for the purposes of identifying which recording was played, who owns it, and so as to route performer and master owner royalties correctly; and that they are used by copyright owners to track usages (downloads, streams, etc.) and to assert rights internationally.

64.    IA knew that by reproducing and distributing copies of sound recordings that were missing ISRC codes and other embedded CMI—including the copies of Plaintiff's recordings—it would make it substantially more difficult or impossible for Plaintiff and other copyright owners to track downstream uses, discover infringement, assert their rights, and collect licensing revenue and royalties.

65.    IA further knew that by reproducing and distributing copies of sound recordings entirely stripped of all categories of CMI, it would conceal infringement and create a significant barrier to enforcement, making discovery of infringement dependent on happenstance, third-party

notification, or other non-traditional means. IA nevertheless distributed such recordings to the general public on a massive scale.

65(b).     Likewise, with respect to the twenty-four (24) musical compositions infringed through IA's scanning and digitization of Plaintiff's printed lyrics and liner notes, IA removed, altered, or failed to carry forward CMI that appeared on the original materials when creating its derivative digital PDF files. IA distributed those digitized files without proper author credits, copyright notices, publishing information, or other identifying metadata, knowing or having reasonable grounds to know that such conduct would conceal infringement and facilitate further unauthorized distribution.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Infringing Reproduction against IA**

66.     Plaintiff repeats and realleges paragraphs 1-65(b) above as if fully set forth herein.

67.     As the sole copyright registrant, Plaintiff owns the exclusive rights in the 59 copyrighted works at issue in this action, consisting of:

(a) five (5) copyrighted sound recordings and the five (5) copyrighted musical compositions embodied therein that were infringed through IA's MySpace Dragon Hoard collection;

(b) one (1) additional copyrighted musical composition infringed through IA's MySpace Dragon Hoard collection;

(c) twenty-four (24) copyrighted musical compositions embodied on two of Plaintiff's CD albums that IA scanned, digitized, and reproduced without authorization; and

(d) twenty-four (24) copyrighted sound recordings fixed on those same two CDs that IA reproduced and ingested through unauthorized digital ripping and digitization, all as explicitly listed in paragraph 2 herein.

68.    By the acts set forth above, IA has infringed Plaintiff's exclusive rights under 17 U.S.C. § 106(1) by reproducing, copying, digitizing, ingesting, and storing on its servers each of the protected sound recordings and musical compositions identified in paragraph 67 herein and in Exhibit 1 to this First Amended Complaint, without Plaintiff's authorization.

69.    At no time did IA have any authorization, permission, license, or consent to reproduce or otherwise use any of Plaintiff's copyrighted works identified in paragraph 67 herein.

70.    Each unauthorized reproduction of a protected sound recording or musical composition by IA constitutes a separate and distinct act of copyright infringement.

71.    IA's acts of infringement were willful, intentional, purposeful, and undertaken in disregard of and with indifference to the rights of Plaintiff.

72.    As a direct and proximate result of IA's infringements, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), including in an amount ranging from $30,000 to $150,000 for each protected sound recording and each protected musical composition infringed, or in such other amount as may be found to be proper under 17 U.S.C. § 504(c).

73.    Plaintiff is entitled to seek attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

**SECOND CAUSE OF ACTION**
**Infringing Public Performance by Means of a Digital Audio Transmission against IA**

74.    Plaintiff repeats and realleges paragraphs 1-65(b) above as if fully set forth herein.

75.    As the sole copyright registrant, Plaintiff owns the exclusive rights in the 5 sound recordings/5 embodied musical compositions, and 1 additional musical composition, the list of which is explicitly set forth in paragraph 2 herein.

76.    By the acts set forth above, IA has infringed Plaintiff's exclusive rights in each of the protected sound recordings and musical compositions that are explicitly set forth in paragraph 2 herein, by performing them publicly by means of a digital audio transmission without authorization in violation of 17 U.S.C. §§ 106(6).

77.    At no time did IA have any authorization, permission, license, or consent to perform publicly by means of a digital transmission or otherwise use Plaintiff's copyrighted works of which are explicitly set forth in paragraph 2 herein.

78.    Each such infringement by IA constitutes a separate and distinct act of infringement.

79.    IA's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.

80.     As a direct and proximate result of the infringements by IA, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), including in an amount ranging from $30,000 to $150,000 per each protected sound recording and each protected musical composition infringed, or in such other amount as may found to be proper under 17 U.S.C. § 504(c);

81.    Plaintiff is entitled to seek attorneys' fees and full costs pursuant to 17 U.S.C. § 505.


**THIRD CAUSE OF ACTION**
**Infringing Distribution against IA**

82.    Plaintiff repeats and realleges paragraphs 1-65(b) above as if fully set forth herein.

83.    As the sole copyright registrant, Plaintiff owns the exclusive rights in the copyrighted works at issue, consisting of: (a) five (5) sound recordings and the five (5) musical compositions embodied therein; (b) one (1) additional musical composition; (c) twenty-four (24) musical compositions embodied on two CD albums digitized by IA; and (d) twenty-four (24) corresponding sound recordings fixed on those same CDs, all as explicitly set forth in paragraph 2 herein.

84.    By the acts set forth above, IA has infringed Plaintiff's exclusive rights in each of the protected sound recordings and musical compositions that are explicitly set forth in paragraph 2 herein, by distributing copies of them publicly without authorization in violation of 17 U.S.C. §§ 106(3).

85.    At no time did IA have any authorization, permission, license, or consent to distribute or otherwise use Plaintiff's copyrighted works of which are explicitly set forth in paragraph 2 herein.

86.    Each such infringement by IA constitutes a separate and distinct act of infringement.

87.    IA's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.

88.    As a direct and proximate result of the infringements by IA, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), including in an amount ranging from $30,000 to $150,000 per each protected sound recording and each protected musical composition infringed, or in such other amount as may found to be proper under 17 U.S.C. § 504(c);

89.    Plaintiff is entitled to seek attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

**FOURTH CAUSE OF ACTION**
**Infringing Public Display against IA**

90.    Plaintiff repeats and realleges paragraphs 1-65(b) above as if fully set forth herein.

91.    As the sole copyright registrant, Plaintiff owns the exclusive rights in twenty-four (24) copyrighted musical compositions, including the lyrics embodied therein, that were scanned, digitized, and publicly displayed by IA, as explicitly set forth in paragraph 2 herein.

92.    By the acts set forth above, IA infringed Plaintiff's exclusive rights in each of those twenty-four (24) musical compositions by publicly displaying unauthorized digital copies of the works on IA's website without Plaintiff's authorization, in violation of 17 U.S.C. § 106(5).

93.    At no time did IA have any authorization, permission, license, or consent to publicly display any of Plaintiff's copyrighted musical compositions identified in paragraph 2 herein.

94.    Each such unauthorized public display constitutes a separate and distinct act of infringement.

95.    IA's acts of infringement were willful, intentional, purposeful, and undertaken in disregard of and with indifference to the rights of Plaintiff.

96.    As a direct and proximate result of IA's infringements, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), including in an amount ranging from $30,000 to $150,000 for each protected musical composition publicly displayed, or in such other amount as may be found proper under 17 U.S.C. § 504(c).

97.    Plaintiff is entitled to seek attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

**FIFTH CAUSE OF ACTION**
**Infringing Derivative Work against IA**

98.    Plaintiff repeats and realleges paragraphs 1-65(b) above as if fully set forth herein.

99.    As the sole copyright registrant, Plaintiff owns the exclusive rights in: (a) twenty-four (24) copyrighted musical compositions, including the lyrics embodied therein, that IA scanned and converted into derivative digital PDF files; and (b) twenty-four (24) copyrighted sound recordings that IA converted into modified digital "audio samples only" files through truncation, editing, or other alteration, all as explicitly set forth in paragraph 2 herein.

100.    By the acts set forth above, IA infringed Plaintiff's exclusive rights under 17 U.S.C. § 106(2) by preparing unauthorized derivative works, namely: (a) downloadable digital PDF reproductions derived from Plaintiff's pre-existing physical CD liner notes and printed song lyrics; and (b) shortened, truncated, edited, or otherwise modified digital audio files created from Plaintiff's copyrighted sound recordings and made available as "audio samples only," all without any license, permission, or other authorization from Plaintiff.

101.    At no time did IA have any authorization, permission, license, or consent to prepare derivative works based upon Plaintiff's copyrighted musical compositions identified in paragraph 2 herein.

102.    Each such unauthorized derivative work constitutes a separate and distinct act of infringement.

103.    IA's acts of infringement were willful, intentional, purposeful, and undertaken in disregard of and with indifference to the rights of Plaintiff.

104.    As a direct and proximate result of IA's infringements, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), including in an amount ranging from $30,000 to $150,000 for each protected musical composition for which an unauthorized derivative work was created, or in such other amount as may be found proper under 17 U.S.C. § 504(c).

105.    Plaintiff is entitled to seek attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## SIXTH CAUSE OF ACTION
### Contributory Infringement against IA

106.    Plaintiff repeats and realleges paragraphs 1-65(b) above as if fully set forth herein.

107.    As the sole copyright registrant, Plaintiff owns the exclusive rights in the 5 sound recordings/5 embodied musical compositions, and 1 additional musical composition all as set forth in paragraph 2 herein.

108.    By the acts set forth above, Plaintiffs' exclusive rights in each of the protected sound recordings and musical compositions as listed in paragraph 2 herein, were directly infringed by unlawful reproductions and distributions to IA by an alleged third-party "anonymous academic group" or some other currently unknown third-party or parties, in violation of 17 U.S.C. §§ 106.

109.    The reproductions and distributions by an alleged third-party "anonymous academic group" or some other currently unknown third-party or parties as described herein, lacked authorization, permission, license, or consent to reproduce and distribute.

110.    IA is contributorily liable for the direct infringements of the alleged third-party "anonymous academic group" or some other currently unknown third-party or parties as described herein.  By willfully accepting a hard drive in the mail from an anonymous third-party or parties that contained digital copies of nearly 500,000 sound recordings (including Plaintiff's as set forth in paragraph 2 herein) all fully-stripped of CMI and produced to IA without any evidence of an existing license or other authorization from Plaintiff for such distribution, IA had actual knowledge or at least red flag knowledge that ingesting said content onto its own servers, hosting said content, uploading copies, making such copies available to the general public at large for free streaming and permanent download through its websites constituted infringement, and thereby materially facilitated and contributed to the anonymous third-party or parties' infringements of same.

111.    Upon information and belief, IA knows the true identity of the allegedly "anonymous" party or parties that sent it the 1.1 terabyte collection of sound recordings that comprised/comprises its MySpace Dragon Hoard, and only has abetted the "anonymity" by reason that IA is aware that having accepted the allegedly "anonymous" party's distribution of approximately 500,000 sound recordings fully stripped of CMI and in which no valid license for their distribution and subsequent upload/re-distribution was provided to it, was likely unlawful conduct under the Copyright Act.

112.    By virtue of providing the storage facilities and hosting servers that enabled the anonymous third-party or parties' infringements via its unlawful reproductions and distributions of Plaintiff's sound recordings and musical compositions to IA, IA had the ability to stop the reproduction, distribution and public performance by means of a digital audio transmission of Plaintiff's protected sound recordings and musical compositions. IA failed to do so, and instead purposefully and knowingly facilitated, encouraged, and materially contributed to the infringements of same as described herein.

113.   Each infringement of Plaintiff's protected sound recordings and musical compositions constitutes a separate and distinct act of infringement.

114.    IA's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.

115.    As a direct and proximate result of the infringements by IA, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), including in an amount ranging from $30,000 to $150,000 per each protected sound recording and each protected musical composition infringed, or in such other amount as may found to be proper under 17 U.S.C. § 504(c);

116.    Plaintiff is entitled to seek attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a judgment in his favor and against Defendant as follows:

A.  For a declaration that Defendant has willfully infringed Plaintiff's protected sound recordings and musical compositions as set forth in paragraph 2 herein;

B.  For statutory damages pursuant to 17 U.S.C. § 504(c) arising from Defendant's willful violations of Plaintiff's rights, including in an amount ranging from $30,000 to $150,000 per work infringed, or in such other amount as may found to be proper under 17 U.S.C. § 504(c);

C.  For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiff's protected sound recordings and musical compositions, including a permanent injunction requiring that Defendant and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the

infringement of any of Plaintiff's exclusive rights under federal law, including without limitation all of the works set forth in paragraph 2 herein;

D.  For an award of Plaintiff's costs and disbursements in this action, including any reasonably incurred attorney's fees, pursuant to 17 U.S.C. § 505;

E.  For an award of pre-judgment and post-judgment interest, to the fullest extent available, on any monetary award made part of the judgment against Defendants; and

F.  For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby respectfully demands a jury trial on all issues so triable in this action.


DATED: January 20th, 2026                          Respectfully Submitted,


                                        _/s/ Anthony Martino_____
                                         Anthony Martino
                                         Plaintiff


## CERTIFICATE OF SERVICE

I certify that on January 20th, 2026, I filed the foregoing document via the Court's CM/ECF system, which will serve a copy on all counsel of record.


                                        _/s/ Anthony Martino_____
                                         Anthony Martino
                                         Plaintiff

# EXHIBIT 1

**EXHIBIT 1 – LIST OF SEPARATELY INFRINGED WORKS
BY CATEGORY, TITLE, AND COPYRIGHT REGISTRATION NUMBER**

**A.) Sound Recordings**
1. Forgiven (SRu982-184, effective date of registration, 6/10/2009)
2. Is That So Wrong? (SRu982-184, effective date of registration, 6/10/2009)
3. All We've Got Is Now (SRu982-184, effective date of registration, 6/10/2009)
4. Your Moment, Your Life (SRu982-184, effective date of registration, 6/10/2009)
5. There's Gotta Be (SRu982-184, effective date of registration, 6/10/2009)
6. Frozen In Love (SRu539-107, effective date of registration, 8/27/2003)
7. Can't Get Through (SRu507-366, effective date of registration, 3/7/2003)
8. Until We Meet Again (SRu507-366, effective date of registration, 3/7/2003)
9. Come To Life (SRu507-366, effective date of registration, 3/7/2003)
10. Deception (SRu507-366, effective date of registration, 3/7/2003)
11. Dreams (SRu507-366, effective date of registration, 3/7/2003)
12. Inevitable (SRu539-107, effective date of registration, 8/27/2003)
13. They're So Right (SRu507-366, effective date of registration, 3/7/2003)
14. Chasing Rainbows (SRu507-366, effective date of registration, 3/7/2003)
15. Married Man (SRu507-366, effective date of registration, 3/7/2003)
16. World Of Wonder (SRu507-366, effective date of registration, 3/7/2003)
17. Why Does She Cry? (SRu507-366, effective date of registration, 3/7/2003)
18. Forever Changed (SRU628-333, effective date of registration, 7/31/2006)
19. Growing Pains (SRU628-333, effective date of registration, 7/31/2006)
20. Note To Self (SRU628-333, effective date of registration, 7/31/2006)
21. Love Extinguisher (SRU628-333, effective date of registration, 7/31/2006)
22. Moat Around Your Heart (SRU628-333, effective date of registration, 7/31/2006)
23. Faces Change (SRU628-333, effective date of registration, 7/31/2006)
24. Just Don't Know (SRU628-333, effective date of registration, 7/31/2006)
25. Remember Me (SRU628-333, effective date of registration, 7/31/2006)
26. More Than You've Known (SRU628-333, effective date of registration, 7/31/2006)
27. The World Outside (SRU628-333, effective date of registration, 7/31/2006)
28. Re-Ignition (SRU628-333, effective date of registration, 7/31/2006)
29. Hopeful (SRU628-333, effective date of registration, 7/31/2006)

**B.) Musical Compositions (Lyrics and Music) (\*Certain registrations listed herein are Sound Recording ("SR") registrations that also cover the underlying musical compositions embodied therein, as Plaintiff is the sole author of both the sound recordings and the musical compositions.)**

30.  Forgiven (Pau3-406-761, effective date of registration, 1/14/2008)
31.  Is That So Wrong? (Pau3-406-761, effective date of registration, 1/14/2008)
32. All We've Got Is Now (Pau3-406-761, effective date of registration, 1/14/2008)
33. Your Moment, Your Life (Pau3-406-761, effective date of registration, 1/14/2008)
34. There's Gotta Be (Pau3-406-761, effective date of registration, 1/14/2008)

35. Withdrawn (Pau3-406-761, effective date of registration, 1/14/2008)
36. Frozen In Love (SRu539-107, effective date of registration, 8/27/2003)
37. Can't Get Through (SRu507-366, effective date of registration, 3/7/2003)
38. Until We Meet Again (SRu507-366, effective date of registration, 3/7/2003)
39. Come To Life (SRu507-366, effective date of registration, 3/7/2003)
40. Deception (SRu507-366, effective date of registration, 3/7/2003)
41. Dreams (SRu507-366, effective date of registration, 3/7/2003)
42. Inevitable (SRu539-107, effective date of registration, 8/27/2003)
43. They're So Right (SRu507-366, effective date of registration, 3/7/2003)
44. Chasing Rainbows (SRu507-366, effective date of registration, 3/7/2003)
45. Married Man (SRu507-366, effective date of registration, 3/7/2003)
46. World Of Wonder (SRu507-366, effective date of registration, 3/7/2003)
47. Why Does She Cry? (SRu507-366, effective date of registration, 3/7/2003)
48. Forever Changed (SRU628-333, effective date of registration, 7/31/2006)
49. Growing Pains (SRU628-333, effective date of registration, 7/31/2006)
50. Note To Self (SRU628-333, effective date of registration, 7/31/2006)
51. Love Extinguisher (SRU628-333, effective date of registration, 7/31/2006)
52. Moat Around Your Heart (SRU628-333, effective date of registration, 7/31/2006)
53. Faces Change (SRU628-333, effective date of registration, 7/31/2006)
54. Just Don't Know (SRU628-333, effective date of registration, 7/31/2006)
55. Remember Me (SRU628-333, effective date of registration, 7/31/2006)
56. More Than You've Known (SRU628-333, effective date of registration, 7/31/2006)
57. The World Outside (SRU628-333, effective date of registration, 7/31/2006)
58. Re-Ignition (SRU628-333, effective date of registration, 7/31/2006)
59. Hopeful (SRU628-333, effective date of registration, 7/31/2006)

# EXHIBIT 2

# Myspace apologizes after losing 12 years' worth of music

By Matthew Robinson, CNN

2 min read · Published 2:34 PM EDT, Mon March 18, 2019



ADVERTISEMENT



Martin Keene/AP

**(CNN) —** Social networking company Myspace has apologized for apparently losing 12 years' worth of music uploaded to its site, following a server migration error – a loss potentially amounting to 50 million songs.

The Los Angeles-based company, which was once a leading music-sharing platform, announced that content uploaded to its site from its inception in 2003 up until 2015 may no longer be accessible.

"As a result of a server migration project, any photos, videos and audio files you uploaded more than three years ago may no longer be available on or from Myspace," the company said in a statement on its website. "We apologize for the inconvenience."

ADVERTISING





**Winter Vacation: Hotel up to -40% off**
Barceló Hotel Group - Sponsored

Book Now

Myspace was the most popular social media site between 2005 and 2008, before Facebook overtook it.



The site is credited with helping launch the careers of numerous artists, including Kate Nash. Matt Cardy/Getty Images Europe/Getty Images

The site is credited with helping launch the careers of numerous international artists, including Kate Nash, Arctic Monkeys and Calvin Harris, who were discovered on the platform.

It has nevertheless been in decline for years, failing to compete with other leading social media and music-sharing platforms including Facebook and YouTube, despite multiple redesigns of the site.

In 2009, the platform employed approximately 1,600 people. It now has a staff of 150, according to the company website.

Andy Baio, a tech expert and former chief technology officer of crowdfunding platform Kickstarter, warned that the music of up to 14 million artists may have been lost. The exact number of tracks lost has yet to be confirmed.



**Andy Baio** · Mar 17, 2019
@waxpancake · **Follow**
Myspace accidentally lost all the music uploaded from its first 12 years in a server migration, losing over 50 million songs from 14 million artists. x.com/textfiles/stat...

**Jason Scott** @textfiles
reddit.com/r/technology/c... Just in case you're wondering how it's going.



**Andy Baio**
@waxpancake · **Follow**

I'm deeply skeptical this was an accident. Flagrant incompetence may be bad PR, but it still sounds better than "we can't be bothered with the effort and cost of migrating and hosting 50 million old MP3s."

12:16 AM · Mar 18, 2019                                    ⓘ

❤️ **1.1K**      💬 **Reply**      🔗 **Copy link**

Read 66 replies

"Myspace accidentally lost all the music uploaded from its first 12 years in a server migration, losing over 50 million songs from 14 million artists," Baio wrote on Twitter.

CNN has contacted Myspace's data protection officer for comment.

Steven Battelle, the former lead vocalist of British rock band LostAlone, expressed sadness at the data loss and said the platform played a pivotal role in the establishment of his group.

"This makes me really sad, so much of the start of my band came from the exposure and community Mspace had," he wrote on Twitter. "I still think it was the best platform for artists / bands. Just music and people who loved the music commenting on it."

Rupert Murdoch's News Corporation bought Myspace in 2005 for $580 million. In 2011, it was sold to digital ad company Specific Media for just $35 million.

## Up next

New BTS single 'Take Two' celebrates their 10th anniversary
1 minute read

BBC apologizes to Trump over editing blunder, rejects defamation claim
4 minute read

The Beats Pill speaker is finally back — and it's awesome
6 minute read

BBC leaders resign amid scandal over misleading edit of Trump speech



# EXHIBIT 3

THOM TILLIS
NORTH CAROLINA

113 DIRKSEN SENATE OFFICE BLDG
WASHINGTON, DC 20510
PH: (202) 224-6342

https://tillis.senate.gov

## United States Senate

WASHINGTON, DC 20510

COMMITTEES

ARMED SERVICES

BANKING, HOUSING, AND URBAN
DEVELOPMENT

JUDICIARY

VETERANS' AFFAIRS

**VIA ELECTRONIC TRANSMISSION**

June 10, 2020

Mr. Brewster Kahle
Founder and Digital Librarian
Internet Archive
300 Funston Avenue
San Francisco, CA 94118

Dear Mr. Kahle:

I write to you again as Chairman of the Senate Judiciary Committee Subcommittee on Intellectual Property. In my April 8, 2020 letter, I expressed my concern that the Internet Archive's announcement of a National Emergency "Library" filled with 1.4 million books that had been digitized and made available to the public without restrictions and without the permission of copyright owners appeared to be a blatant infringement of thousands—if not more—of copyrights.[1] Indeed, the U.S. Copyright Office analyzed publicly available facts and concluded that though some works included in the National Emergency "Library" might be permitted under fair use, many would not be. The Copyright Office went on to say that "while the Internet Archive's goal of making research and educational materials publicly available may be laudable, so is respect for copyright."[2] I write now after learning that the Internet Archive is engaged in other initiatives that involve the unauthorized digitization and dissemination of copyright-protected creative works—in this case sound recordings.

According to a May 15, 2020 article in the *Seattle Times*, the Internet Archive has purchased Bop Street Records' full collection of 500,000 sound recordings with the "inten[t] to digitize the recordings and put them online, where they can be streamed for free."[3] It is not clear from the

---

[1] Since then, I understand that major American book publishers—Hachette Book Group, HarperCollins Publishers, John Wiley & Sons and Penguin Random House—filed a lawsuit alleging copyright infringement and seeking to enjoin uses of their copyrighted books in the National Emergency Library or the Internet Archive's "Open Library," which had offered the same catalog of books but with some limitations, such as checkout waitlists. *See Hachette Book Grp. v. Internet Archive*, No. 1:20–cv–04160 (S.D.N.Y. filed June 1, 2020).

[2] Letter from Maria Strong, Acting Register of Copyrights, U.S. Copyright Office, to Sen. Tom Udall, at 21 (May 15, 2020).

[3] Paul de Barros, *A Happy Ending for Seattle's Bop Street Records: A Nonprofit Buys Up the Entire Collection*, SEATTLE TIMES (May 15, 2020), https://www.seattletimes.com/entertainment/music/a-happy-ending-for-seattles-bop-street-records-a-nonprofit-buys-up-the-entire-collection/.

CHARLOTTE OFFICE:
9300 HARRIS CORNERS PKWY
SUITE 170
CHARLOTTE, NC 28269
PH: (704) 509–9087

RALEIGH OFFICE:
310 NEW BERN AVE
SUITE 122
RALEIGH, NC 27601
PH: (919) 856–4630

HIGH POINT OFFICE:
1840 EASTCHESTER DR
SUITE 200
HIGH POINT, NC 27265
PH: (336) 885-0685

GREENVILLE OFFICE:
1694 E ARLINGTON BLVD
SUITE B
GREENVILLE, NC 27858
PH: (252) 329–0371

HENDERSONVILLE OFFICE:
1 HISTORIC COURTHOUSE SQ
SUITE 112
HENDERSONVILLE, NC 28792
PH: (828) 693–8750

article, or others, if you intend to digitize all of the sound recordings acquired from Bop Street. But it is clear that these sound recordings were very recently for sale in a commercial record shop and likely contain many sound recordings that retain significant commercial value. This raises serious alarms about copyright infringement.

As I understand, Bop Street Records, which the *Wall Street Journal* once deemed a top-five record shop in the country, focuses on collectible-quality vinyl records across a diverse range of musical genres. According to its website, there sound recordings includes "Rock, Soul/R&B, Jazz, Blues, Classical, Country, World and many other genres from the 1920's to 1990's." The overwhelming majority—if not all—of these sound recordings are protected by U.S. copyright law, and thus may not be digitized and streamed or downloaded without authorization.

In a similar vein, I am aware of the Internet Archive's "Great 78 Project," which has already digitized—and continues to digitize daily—a vast trove of 78 rpm recordings, many of which are also commercially valuable recordings already in the marketplace, and has made those recordings available to the public for free through unlimited streaming and download. I understand that the Internet Archive is framing this and its other sound recording projects— which include both obscure gems for music fans and hits from the likes of Elvis Presley, Chuck Berry, and Johnny Cash—as preservation, but your current practices raise numerous potential issues of copyright infringement. The Bop Street collection is likely to add to that. Among other things, your sound recording projects do not appear to comply with the relevant provisions of the Orrin G. Hatch–Bob Goodlatte Music Modernization Act (MMA), which deals only with pre-1972 sound recordings and would not allow for streaming or downloading. Moreover, there are additional copyrights, such as the musical composition and the album artwork, that are displayed on the Internet Archive website and would not be covered by an exception for preservation.

I recognize the value in preserving culture and ensuring that it is accessible by future generations, such as the Library of Congress's Recorded Sound Collection and National Recording Registry projects. But I am concerned that the Internet Archive thinks that it—not Congress—gets to determine the scope of copyright law. With its sound recording projects, the Internet Archive does not even pretend that a national emergency like the Covid-19 pandemic creates a special need for these sound recordings to be freely streamed or downloaded. Rather, the Internet Archive seems to be daring copyright owners to sue to enforce their rights, or else effectively forfeit them—something many copyright owners, particularly individuals and smaller enterprises, cannot afford to do.

Our copyright system is designed with important limitations and exceptions that ensure that the public can make appropriate uses of copyrighted works even when the copyright owner seeks to prevent such uses—but those are the exception, and free use for those who disagree with the concept of exclusive rights is not one of them. Accordingly, I once again invite you to share with me the legal support, in copyright law or elsewhere, for reproducing and distributing copyrighted works that are owned by others. In particular, how do the Internet Archive's sound recording digitization and streaming projects—in particular the Great 78 Project—fit within case law interpreting the fair use doctrine and within the relevant provisions of section 108 and the MMA?

Please respond by July 10, 2020. If you have any questions, please do not hesitate to contact me.

Sincerely,

Thom Tillis
Chairman
Subcommittee on Intellectual Property

# EXHIBIT 4

1   library, specifically looking for this Wolf Hall book,

2   would be presented with the donate button.  We can agree

3   on that; right?

4       A.  Yes.

5       Q.  And would you agree with me that this is another

6   way in which Internet Archive monetizes its lending

7   library web pages?

8           MS. LANIER:  Objection.  Scope, vague.

9           THE WITNESS:  That is a very broad

10  interpretation.

11      Q.  BY MR. BROWNING:  Of monetizing?  You know, if

12  you want to define it, but I mean, as I understand

13  monetize is makes money from, and what -- you know, do

14  you disagree with me that the donate button is not a way

15  to make money from the lending library?

16         MS. LANIER:  Same objection.

17         THE WITNESS:  It's -- the donate button takes

18  you to the general page of the Internet Archive, and it

19  doesn't mean that the money that's being given would

20  specifically go to the Open Library.

21      Q.  BY MR. BROWNING:  I understand that, but it will

22  go to Internet Archive.

23      A.  It will go to Internet Archive.

24      Q.  Okay.  So I'm going to have one more try at

25  this.  So would you agree with me that this web page is

1  monetized?

2         MS. LANIER: Objection. Scope, vague.

3         THE WITNESS: I mean, every single page of the

4  Archive is monetized.

5     Q. BY MR. BROWNING: Okay. Mr. Cressaty, let's

6  move on.

7         MR. BROWNING: Carl, there's going to be a jump

8  here. Can we go to Tab 28, please?

9         MR. MAZUREK: Yes.

10         (Exhibit 89, INTARC00138102, marked for

11            identification electronically by counsel.)

12         MR. MAZUREK: It should be in the shared folder.

13     Q. BY MR. BROWNING: And before I pull -- or we

14  pull this up, Jacques, I have a question for you. Do you

15  believe that Internet Archive is a public library?

16     A. I do.

17     Q. What is the basis for that belief?

18     A. We make the books available to patrons for free.

19     Q. Are you aware of Internet Archive being

20  accredited as a library by any governmental institution?

21     A. Yes, I am.

22         MS. LANIER: Objection. Scope.

23     Q. BY MR. BROWNING: Who -- what -- tell me what

24  you know about that.

25         MS. LANIER: Same objection.